[No. B174101. Second Dist., Div. Five. May 31, 2005.]

ANNE TROP, Plaintiff and Appellant, v.
SONY PICTURES ENTERTAINMENT INC., et al., Defendants and
Respondents.

## COUNSEL

Irving Meyer for Plaintiff and Appellant.

O'Melveny & Myers, Scott H. Dunham, Timothy B. McCaffrey, Jr., and Jennifer S. Vanse for Defendants and Respondents.

OPINION

**KRIEGLER, J.—**

## INTRODUCTION

Plaintiff and appellant Anne Trop was terminated from her position at Tall Trees Productions as an assistant for movie producer and director Betty Thomas. Trop, who was pregnant at the time of her termination, brought an action against defendants and respondents Sony Pictures Entertainment, Inc. and Tall Trees alleging, among other things, sexual discrimination based on pregnancy and wrongful termination in violation of public policy, also based on pregnancy.[1] Trop's pregnancy-related causes of action were based on statements Thomas allegedly made to Trop in the months prior to Trop's termination and at the termination meeting that demonstrated that Thomas did not want to employ a pregnant assistant.

Defendants obtained summary adjudication in their favor on Trop's causes of action for sexual discrimination and wrongful termination. Trop's other causes of action having been dismissed, the trial court entered judgment in favor of defendants. Trop argues on appeal that the trial court erred in granting summary adjudication. Because the record establishes that Thomas had no knowledge of Trop's pregnancy at the time Trop was fired, we conclude Trop failed to make out a prima facie case sufficient to withstand summary judgment.[2] Alternatively, assuming Trop did present a prima facie case of discrimination, we conclude the record establishes that Trop was fired for poor job performance and not due to discrimination based on pregnancy. We therefore affirm the judgment.

## BACKGROUND

Defendants filed a motion for summary judgment on two separate grounds. First, defendants argued Trop failed to establish a prima facie case of discrimination because defendants did not know Trop was pregnant at the

---

[1] Trop did not allege in the sixth or seventh causes of action that she was fired because she was *attempting* to become pregnant. A cause of action may be based upon an adverse employment action directed at a woman who is trying to become pregnant (*Kocak v. Community Health Partners of Ohio, Inc.* (6th Cir. 2005) 400 F.3d 466, 470), but no such allegation is contained in Trop's complaint. Because the pleadings define the issues to be addressed at the summary judgment stage (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98, fn. 4 [93 Cal.Rptr.2d 820]) and Trop pleaded she "was a pregnant woman terminated from her employment because of her pregnancy," the issue of discrimination on the basis of potential pregnancy is not before this court. To the extent Trop argues this theory on appeal, we reject it for the foregoing reasons.

[2] We deny Trop's motion to augment the record.

time she was fired, and her work performance was unsatisfactory. Second, defendants contended that if Trop did establish a prima facie case, the evidence was uncontraverted that Trop, an at-will employee, was fired because of her inadequate work, not due to her pregnancy.

Tall Trees, a general partnership between two corporations—Tub O'Laughs, Inc. and Girls On Top, Inc., entered a three-year "first look" agreement with Columbia Pictures Industries, Inc., a division of Sony. Under the agreement, Tub O'Laughs, Inc. loaned Thomas to Tall Trees to provide services as a producer and director, and Girls On Top, Inc. loaned Jenno Topping to Tall Trees to provide services as a producer. Sony agreed to pay a specific amount per year to Tall Trees for overhead, including the salaries and benefits of six staff employees plus an assistant for Thomas.

In May 2001, Thomas hired Trop as her assistant prior to beginning work on the movie "I Spy." Trop, who was not Thomas's first choice, was hired to replace Thomas's then current assistant with whose performance Thomas was dissatisfied. Trop signed a Sony Pictures' employment application, indicating she was an at-will employee.

In June 2002, Trop began trying to become pregnant. During the summer of 2002, Trop had a discussion with Elisabeth Peery, a Tall Trees producer, regarding her efforts to get pregnant. No one else was present during those conversations, and Peery did not disclose Trop's intent with any Tall Trees employee.

On September 28, 2002, Trop met with Lisa Sutton and Amy Lafayette, whom she believed to be herbal or Chinese doctors. Trop told them that she was trying to become pregnant and had a "session" with them during which they gave her acupuncture and herbs. Trop asked Sutton and Lafayette, who were good friends of Thomas and Topping, not to "tell anyone at Tall Trees about this." She wanted to be able to tell her fellow employees when she was pregnant.

The following week, Trop, Topping, and other Tall Trees employees were chatting in the office when Topping looked at Trop and said, "You had a good reading with [Sutton] and [Lafayette]." Trop asked Topping what she meant. Topping responded that the future looked good for Trop and "made this belly thing." Trop was shocked and wondered if Sutton and Lafayette had disclosed her plans to Topping.

By mid-October 2002, "I Spy" had concluded. According to Thomas, she noticed deficiencies in Trop's performance around that time. Trop began making mistakes with phone numbers and handling incoming calls. Thomas believed that Trop's attitude and enthusiasm for her work were declining. Thomas confronted Trop about her deficiencies and found her response to be "very cavalier."

In her deposition, Trop admitted that on four occasions she recorded telephone numbers incorrectly on phone messages for Thomas. She also admitted that she incorrectly recorded telephone numbers on three occasions on lists of frequently called numbers she prepared for Thomas. Trop contended, however, that she made those mistakes over her entire employment and not just in the final few months.

At the end of October 2002, Trop told Thomas that she needed to have a fibroid removed. Thomas consulted her calendar and confirmed that the date Trop wanted to have the procedure was convenient. Then, Thomas asked Trop, "What are you trying to do, get pregnant?" Trop responded, "Trying." Thomas "sarcastically" retorted, "Well, good luck."

In early November 2002, Thomas approved Trop's request for a three and a half-week vacation trip to England. Trop was to be off from December 14, 2002, through January 6, 2003. Although Thomas did not tell Trop that she would be fired for taking the trip, Thomas was very annoyed by Trop's extended absence, as Thomas was to begin preproduction on a new film, "Surviving Christmas," and a few other projects during that time.

Around this time, Vivian Cao, a receptionist and general assistant at Tall Trees, noticed that Thomas was "becoming more and more displeased with [Trop's] work." In the months prior to Trop's trip to England, Thomas spoke to Peery two or three times about her dissatisfaction with Trop's work.

According to Thomas, her frustration with Trop's performance had reached the level in the beginning of November 2002 that she decided to fire Trop. In November and December 2002, Thomas spoke with Tony Peyrot, Tall Tree's business manager; Michael Wimer, her agent; and Topping about replacing Trop.

Thomas asked Peyrot to look for candidates to replace Trop. On December 10, 2002, Peyrot faxed "to Tall Trees the resume of a potential candidate with the intention that she ultimately replace" Trop as Thomas's assistant. The facsimile was sent to Trop's attention.

On December 13, 2002, Trop took a home pregnancy test. The test results were "light pink" or "light positive." Trop was "beyond thrilled." At the same time, she was "hopeful," but "not sure" that she was pregnant. Later that night, Trop went to the Tall Trees Christmas party at Thomas's home.

At some point during the evening, Trop went into the kitchen, where she saw and played with Topping's infant daughter, Mattie. According to Trop, in the presence of Thomas, Trop said, "It looks like I get to have one of my own." Thomas responded, "Not while you are working for me." Trop did not amplify upon that exchange.

Later that night, Sutton and Lafayette asked Trop if she was pregnant. Trop said that it looked like she was. She explained that she had taken a test that day and the results were "a sort of a positive." Sutton and Lafayette were happy and congratulatory. Both Sutton and Lafayette understood that Trop did not want them to tell anyone, and they did not.

Trop left for her trip to England the next day. She took "two more pregnancy tests with [her] and it was positive." Due to inclement weather, Trop was unable to return from England as scheduled—returning to the office two or three days late. Trop attempted to call Thomas to alert her that she was delayed, but Thomas was not available. Instead, Trop left a message with Cao. Trop visited her doctor upon her return from England and confirmed that she was pregnant.

When Trop returned to work, she noticed a change in Thomas's attitude towards her. Thomas did not welcome her back and "was asking [other employees] to do things and it just seemed like she was sort of off me, that I had done something wrong, and I didn't really know what that was."

The day after Trop's return, Thomas left for a few days to teach a class at Ohio State University. A few days after her return from Ohio, Thomas was to leave for Chicago to begin filming the movie "Surviving Christmas." Trop asked Thomas if she could accompany her. Thomas said that she already had someone in Chicago who was going to help her and asked Trop to contact that person and explain how she (Thomas) liked things done. In the past, Trop had always traveled on such trips with the directors for whom she had worked. When Thomas declined to take her to Chicago, Trop knew "something was up."

After Thomas left for Chicago, Trop told Peery that she was pregnant. Trop did not ask Peery to keep her pregnancy a secret. Peery did not discuss Trop's pregnancy with Thomas, Topping, or any other Tall Trees employee prior to Trop's termination.

Early in the morning on January 17, 2003, after Thomas had returned from Chicago, Trop began to "spot" while at work. Trop went to her doctor, who told her that "spotting" was normal and everything looked fine. Trop's doctor told her, however, that she should not lift anything and should go home and rest. Instead, Trop returned to work.

Later that day, as Trop was lifting a box into Thomas's car, she started crying, thinking to herself, "What are you doing? What's more important, your baby or lifting a box?" Cao saw Trop and asked her what was wrong. Trop explained that she was pregnant and should not have been lifting the box. Cao was "stunned." Trop asked Cao not to tell anyone, and Cao honored the request.

On about January 24, 2004, Thomas returned from a second trip to Chicago. According to Thomas, Trop had left a series of messages on Thomas's home phone detailing mistakes Trop had made. Each message included the phrase "my bad," acknowledging fault for the mistake addressed in the message. The messages reinforced Thomas's belief that Trop was making her work life more difficult and that she could not go on with Trop as her assistant.

On January 28, 2003, Thomas met with Trop and fired her. According to Trop, Thomas gave her three reasons. First, Thomas stated that she needed "somebody here who wants to be here and who doesn't have a life." Trop asked Thomas if she was talking about the vacation she had taken. Thomas said she was. Second, Thomas told Trop that she had taken a phone message from a particular person and had recorded the wrong number. Third, while Thomas was in a meeting with a writer on the movie "Valley of the Dolls 2," Trop had put through a call from the head of 20th Century-Fox concerning that movie, and Thomas had not wanted the writer to know that the studio head had called.

Thomas's and Trop's versions of what happened next differ markedly. According to Trop, after Thomas fired her, she began to cry. She took a moment to regain her composure and said, "You knew I was pregnant. You knew that," or "You know I am pregnant." Thomas then went "crazy," asking, "What were you thinking? How could you possibly be my assistant and be pregnant? How did you think that ever was going to work?" Trop responded, "I actually wasn't thinking about that." Thomas asked, "How could you possibly—how was that going to work for you?" Trop said, "Women get

pregnant every day." Thomas responded, "Well, that was never going to happen here. It would never happen here." Before Thomas left the meeting, she told Trop that she could have a month to find another job.

According to Thomas's version of the meeting, after she fired Trop, Trop began to cry. Trop said, "I don't want to." Thomas said, "What? What is it?" Trop said, "I don't want to tell you, because you're going to think I'm saying this because you fired me." Thomas said, "Say it. What is it? Say it." Trop said, "I'm pregnant." Thomas was shocked and said something to the effect of, "Do you want to be pregnant." Thomas thought that Trop might not have considered all of her "options" and that was why she was crying.

Thomas said she asked Trop why she had not told her. According to Thomas, Trop responded that she was not sure she was pregnant. Thomas said, "You're kidding. You're—what are you thinking. How will you do this? What's your situation?" Thomas could not understand how Trop was going to lead her life. Thomas offered to give Trop a good recommendation and to help her find another job. According to Thomas, prior to that meeting, neither Trop nor anyone else had told her that Trop was pregnant or trying to become pregnant.

Thomas told a human resources employee at Sony the reasons she fired Trop. As Thomas recalled at her deposition, she told the employee that she terminated Trop for "poor performance that had been going on for months . . . a lack of enthusiasm about the job, which was reflected in desire to be at work, the lack of desire to be at work, the long vacation that she desired to take, the return from the vacation that was surprisingly longer." "Poor performance" included a number of perceived deficiencies. Thomas conceded she never expressly told Trop that her performance was poor.

After her termination, Trop asked Sutton if she had told Thomas that she was trying to become pregnant. Sutton denied telling Thomas. In declarations submitted with defendants' motion for summary adjudication, Sutton and Lafayette declared that they had not told anyone that Trop had sought medical treatment from them to become pregnant. They explained that they believed the physician-patient privilege precluded such disclosure and Trop had sworn them to secrecy. When Trop told Sutton and Lafayette that she was pregnant at the December 2002 Tall Trees holiday party, they understood the disclosure had been made in confidence. Sutton and Lafayette never discussed Trop's pregnancy, or her efforts to become pregnant, with Thomas or any other Tall Trees employee.

Trop also asked Peery if she had said anything to Thomas. Peery denied talking to Thomas about Trop's pregnancy or efforts to become pregnant. In a declaration submitted with defendants' motion for summary adjudication, Peery declared that she never discussed Trop's efforts to become pregnant or her pregnancy with Thomas, Topping, or any other Tall Trees employee prior to Trop's termination. Cao likewise declared that she had not discussed Trop's pregnancy with Thomas, Topping, or any other Tall Trees employee.

Trop filed an action alleging seven causes of action. Trop dismissed the first five causes of action. Defendants brought a motion for summary adjudication as to the sixth cause of action for sexual discrimination based on pregnancy and seventh cause of action for wrongful termination in violation of public policy based on pregnancy. The trial court granted defendants' motion, finding that Thomas fired Trop because she was dissatisfied with Trop's work performance and Thomas did not know that Trop was pregnant at the time she decided to fire Trop.

## DISCUSSION

*Standard of Review*

■ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ On appeal from a summary judgment, we make "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].)

■ Although "[t]he purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493]), our Supreme Court has warned that the summary judgment "procedure is drastic and should be used with caution in order that it may not become a substitute for existing methods in the determination of issues of fact" (*Eagle Oil & Ref. Co. v. Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264]). Accordingly, declarations of the moving party are strictly construed, those of the opposing party are liberally construe, and all doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on finding issues of fact; it does not resolve them. The court seeks to find contradictions in the evidence or inferences reasonably deducible from the evidence that raise a

triable issue of material fact. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865–866 [247 Cal.Rptr. 504].)

## A. *General Principles of Law*

 California's Fair Employment and Housing Act (FEHA) prohibits an employer from terminating an employee because of her sex. (Gov. Code, § 12940, subd. (a).) "Sex" within the meaning of the FEHA includes "pregnancy, childbirth, or medical conditions related to pregnancy or childbirth." (*Id.*, § 12926, subd. (p).) FEHA provisions may provide the policy basis for a claim for wrongful termination in violation of public policy. (*Phillips v. St. Mary Regional Medical Center* (2002) 96 Cal.App.4th 218, 227 [116 Cal.Rptr.2d 770].)

 Because state and federal employment discrimination laws are similar, California courts look to pertinent federal precedent in applying California statutes. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).) California has adopted a three-stage burden-shifting test established by the United States Supreme Court for trying employment discrimination claims that are based on the disparate treatment theory. (*Guz, supra,* 24 Cal.4th at p. 354, citing, inter alia, *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*).) Under this "*McDonnell Douglas* test," (1) the plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff is successful, the employer must offer a legitimate nondiscriminatory reason for its actions; and (3) if the employer produces evidence on that point, the plaintiff must show that employer's reason was a pretext for discrimination. (*Guz, supra,* 24 Cal.4th at pp. 354–356; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68 [105 Cal.Rptr.2d 652] (*Morgan*).)

 The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be *inferred* from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354, italics added.)

The United States Supreme Court has held, however, that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." (*Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121 [83 L.Ed.2d 523, 105 S.Ct. 613]; see also *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150–151, fn. 7 [65 Cal.Rptr.2d 112] ["The *McDonnell Douglas* test is typically used in

cases where the plaintiff lacks 'direct' evidence of the employer's discriminatory intent"].) Direct evidence is evidence which proves a fact without inference or presumption. (*Morgan, supra,* 88 Cal.App.4th at p. 67.) "Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor." (*Morgan, supra,* 88 Cal.App.4th at pp. 67–68.)

### B. *Plaintiff Failed to Establish a Prima Facie Case of Discrimination*

We conclude that Trop has failed to satisfy the first prong of the *McDonnell Douglas* test because Trop failed to raise a triable issue of fact that Thomas knew Trop was pregnant before Trop was fired. An employee cannot make out a prima facie case of discrimination based on pregnancy under FEHA in the absence of evidence the employer knew the employee was pregnant. (*Geraci v. Moody-Tottrup Intern., Inc.* (3d Cir. 1996) 82 F.3d 578, 581 (*Geraci*).) "When the pregnancy is apparent, or where plaintiff alleges that she has disclosed it to the employer, then a question of the employer's knowledge would likely preclude summary judgment. If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant." (*Ibid.*)

After establishing the employee's burden of demonstrating that the employer was aware of the pregnancy in order to establish a prima facie case, the court in *Geraci* applied the law to the facts as follows: "The application of this legal framework to the facts of Geraci's case need not detain us long. Geraci was not visibly pregnant; indeed, even Geraci herself did not know until shortly before she told her co-workers. She did not tell Moody management, and she requested that the six friends and co-workers to whom she disclosed her pregnancy *not* tell management. [¶] Geraci argues that, because she told six out of twenty co-workers that she was pregnant and that her pregnancy became a 'common topic of discussion in the office,' management must have known it before it terminated her. Her managers, however, filed declarations disclaiming knowledge, and Geraci presented no evidence to the contrary. Geraci deposed only one of the co-workers whom she told of her pregnancy, and he testified that he did not tell management that she was pregnant. Thus, Geraci would have us remand this case for trial on the sheer speculation that one or more of the people she entrusted with highly personal information violated her confidence *and* that members of Moody management lied about their lack of knowledge. This is simply insufficient to create a genuine issue of material fact." (*Geraci, supra,* 82 F.3d at pp. 581–582.)

The facts in *Geraci* are remarkably similar to the instant case. Trop presented no evidence that she was visibly pregnant. She did not tell Thomas she was pregnant. While Trop did tell others at Tall Trees of her pregnancy, she either asked them to maintain her confidence, or they assumed Trop wanted the information kept confidential, and none of the employees told Thomas of the pregnancy. Trop's comments about having a fibroid removed and hoping to become pregnant fall far short of establishing that Thomas was aware of Trop's pregnancy. Trop's statement to Thomas at the December 2002 Christmas party ("It looks like I get to have one of these," referring to a baby) is so ambiguous as to be insufficient, as a matter of law, to establish that Thomas knew Trop was pregnant. Trop only told Thomas she was pregnant after Thomas told Trop she was being terminated from employment. In the absence of credible evidence that Thomas knew Trop was pregnant, she failed to establish a prima facie case of discrimination and summary judgment was properly granted to the defendant.

## C. *The* McDonnell Douglas *Test*

Assuming Trop's evidence can be construed as supporting a finding that Thomas was aware of Trop's pregnancy, we further hold that Thomas presented a nondiscriminatory basis for firing Trop based upon poor job performance, and that Trop did not present credible evidence to overcome the nondiscriminatory reason for the firing. In so ruling, we reject Trop's argument that she presented direct evidence of discrimination which would have rendered the *McDonnell Douglas* test inapplicable.

### 1. *Lack of Direct Evidence of Discrimination*

Trop argues she presented direct evidence of discrimination, taking the case outside of the *McDonnell Douglas* analysis. In her opening brief, Trop identifies the following as direct evidence of discrimination: (1) After Trop was fired, Thomas said, "I need somebody here who wants to be here and doesn't have a life"; (2) When Trop told Thomas she was pregnant after being fired, Thomas said: "What were you thinking? How could you possibly be my assistant and be pregnant? How did you think that ever was going to work?" "Do you want to be pregnant? I had thought maybe [Trop] hadn't considered all her options, that she had made a mistake somehow. . . . You know, there are things you can do. You could . . . . How was she going to take care of him?" "I couldn't understand how she was going to live her life"; (3) When Trop told Thomas, "Women get pregnant every day," Thomas

allegedly replied, "Well, that was never going to happen here. It would never happen here"; and (4) At the December 2002 Christmas party Trop said, "It looks like I get to have one of my own," to which Thomas replied, "Not while you are working for me."

The statements relied upon by Trop do not constitute direct evidence. In *Kennedy v. Schoenberg, Fisher & Newman, Ltd.* (7th Cir. 1998)140 F.3d 716 (*Kennedy*), the court held the following evidence did not constitute direct evidence of discrimination sufficient to take the court out of the *McDonnell Douglas* framework:

■ "Plaintiff argues that certain comments and conduct by Goldberg qualify as evidence of intentional discrimination. Specifically, plaintiff points to the following alleged remarks and conduct by Goldberg: (1) soon after Goldberg became aware that plaintiff was pregnant, he 'repeatedly told [plaintiff] that "if you were my wife, I would not want you working after having children" ' and told other SF & N employees that plaintiff 'should be home with her kids now, with her child now, that she shouldn't be working'; (2) less than four weeks after plaintiff announced her pregnancy, Goldberg wrote a memorandum dated November 26, 1991, criticizing plaintiff's work performance; (3) Goldberg responded 'Yes' to plaintiff's inquiry as to whether he was building a 'case' against plaintiff; and (4) while Goldberg and plaintiff were friendly before plaintiff announced her pregnancy, plaintiff claims that '[s]hortly after Goldberg learned of Ms. Kennedy's pregnancy, [Goldberg] became distant, cold, and acrimonious toward Ms. Kennedy.' We agree with the district court's conclusion that none of the above comments and conduct by Goldberg constituted enough evidence to avoid summary judgment on plaintiff's claim that her discharge was a result of intentional discrimination. [¶] Direct evidence is that which, 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.' [Citations.] ■ Direct evidence of discriminatory intent in pregnancy discrimination cases generally is in the form of an admission by a supervisor or decision maker that the employee was suspended because she was pregnant. [Citation.] To rise to the level of direct evidence of discrimination, this Court has stated that 'isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process.' [Citation.]" (*Kennedy, supra,* 140 F.3d at p. 723.)

"Here none of the comments and conduct by Goldberg indicate that at the time defendant SF & N made its decision to terminate plaintiff, it was motivated by plaintiff's pregnancy in deciding to discharge her. Specifically, the comment attributed to Goldberg, 'if you were my wife, I would not want you working after having children,' does not demonstrate an acknowledgment of discriminatory intent in connection with defendant SF & N's decision to

discharge plaintiff. The comment was made at least five months before plaintiff's termination and thus was not temporally related to her discharge. In addition, there was no causal nexus between the comment and plaintiff's discharge. The alleged remark, made while Goldberg and plaintiff were discussing the 'joys of children,' occurred in a casual setting unrelated to discussions regarding the issues which led to plaintiff's dismissal." (*Kennedy, supra,* 140 F.3d at p. 724.)

■ The court in *Kennedy* cited with approval from its earlier holding in *Geier v. Medtronic, Inc.* (7th Cir. 1996) 99 F.3d 238 (*Geier*), a case in which a supervisor said to an employee: " 'Have all the kids you would like— between spring, summer, and fall. I will not work your territory during the winter months.' " (*Id.* at p. 242.) *Geier* rejected the argument that the supervisor's statement constituted direct evidence of discrimination. "The comment, while awkward, insensitive and ungenerous, does not rise to the level of direct evidence of discrimination. To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process. [Citations.] [The supervisor's] comment was made a full year prior to Geier's discharge and thus not temporally related to Geier's dismissal. While the remark was made by Geier's supervisor, there is no causal nexus between the remark and decision to discharge. The comment was made in a casual conversation during a long car trip, a setting unrelated to discussions of Geier's repeated work deficiencies, which eventually led to her dismissal. Further, the comment indicated an unwillingness to accept absences due to child birth in the winter. Geier's second pregnancy would have come to term in August or September. If we accept [the supervisor's] remark as a serious threat or instruction, it would not apply to Geier's pregnancy. The comment, construed in the light most favorable to Geier, cannot meet the requisite temporal or causal criteria." (*Ibid.*)

As in *Kennedy* and *Geier,* the remarks by Thomas in the instant case do not rise to the level of direct evidence of discrimination based on pregnancy. Trop relies heavily on her statement at the Christmas party in December 2002 ("It looks like I get to have one of these") and Thomas's response ("Not while you are working for me") as direct evidence that she was fired due to discrimination based on her pregnancy. We disagree. Trop's ambiguous statement was made in a casual conversation at a Christmas party more than one month before Trop was fired. This conversation was unrelated to Trop's work performance and there was no evidence of a causal relationship between Thomas's statement and the decision to terminate Trop's employment. As noted above, Trop presented no direct evidence that Thomas knew Trop was

pregnant until after Thomas fired Trop. The comments Thomas made after firing Trop do not show that Thomas knew Trop was pregnant until after Trop was terminated from her job. Trop admitted in her deposition that Thomas gave her three reasons for the firing—lost messages, lack of interest in work, and a phone call put through at an inopportune time—none of which pertain to Trop's pregnancy. Consistent with *Kennedy* and *Geier*, we reject Trop's argument that the record contains direct evidence of discrimination based on pregnancy.

### 2. *Application of the* McDonnell Douglas *Test to Trop's Termination*

■ Having determined that the record lacks direct evidence of discrimination based on pregnancy, we now analyze the summary judgment motion under the *McDonnell Douglas* test, drawing largely on the application of that test as set forth in *Guz*. We begin by noting that Trop was an at-will employee, who could be terminated from employment at any time without case, for any or no reason, and subject to no procedure except the statutory requirement of notice. (Lab. Code, § 2922; *Guz, supra,* 24 Cal.4th at p. 335; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 680 [254 Cal.Rptr. 211, 765 P.2d 373].) ■ In order for Trop to defeat defendants' summary judgment motion, "there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's action." (*Guz, supra,* 24 Cal.4th at p. 361, citing *St. Mary's Honor Center v. Hicks* (1993) 509 U.S 502, 510–520 [125 L.Ed.2d 407, 113 S.Ct. 2742].)

■ Defendants satisfied the second step of the *McDonnell Douglas* formula by presenting competent, credible, and admissible evidence of nondiscriminatory reasons for terminating Trop's employment. "If the employer produces substantial evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination created by the prima facie case ' "simply drops out of the picture." ' [Citations.]" (*Morgan, supra,* 88 Cal.App.4th at p. 68.) Defendant's reasons for terminating Trop's employment were creditable on their face—her job performance did not meet Thomas's demanding standards. Indeed, Trop did not dispute that she mishandled telephone messages, took an extended vacation during a busy period of work, and returned to work late from the vacation. Defendants presented evidence that Thomas decided in November 2002 to replace Trop and solicited resumes before Trop knew she was pregnant. Thomas also expressed her dissatisfaction with Trop without knowing that Trop was pregnant. These nondiscriminatory factors constituted legitimate reasons for Thomas's decision to terminate Trop from her at-will position.

Trop could have defeated summary judgment under the third step of the *McDonnell Douglas* test by presenting evidence that decisions leading to Trop's firing were actually made on the prohibited basis of her pregnancy. (See *Guz, supra,* 24 Cal.4th at p. 360 [once employer showed nondiscriminatory basis for firing, burden shifted back to the plaintiff to show termination was "actually made on the prohibited basis of his age"].) Trop failed to raise a triable issue that her termination was based on pregnancy. Plaintiff produced no evidence to rebut defendants' showing that: (1) Thomas made the decision to fire Trop before Trop learned she was pregnant; (2) Trop's job performance was unsatisfactory for Thomas's needs; and (3) Thomas did not know of Trop's pregnancy until after the firing. As a matter of law, defendants were entitled to summary judgment on Trop's claim.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal.

Turner, P. J., concurred.

**MOSK, J.,** Dissenting.—I respectfully dissent.

Because plaintiff Anne Trop presented direct evidence of discrimination (*Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121 [83 L.Ed.2d 523, 105 S.Ct. 613]), the *"McDonnell Douglas"* test (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; see *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68 [105 Cal.Rptr.2d 652] [direct evidence is evidence which proves a fact without inference or presumption] (*Morgan*)) is not applicable. Evidence of the statements of Betty Thomas (Trop's supervisor at Tall Trees Productions) at Trop's termination, satisfied the direct evidence standard for statements disclosing a discriminatory bias against pregnant employees (*Kennedy v. Schoenberg, Fisher & Newman, Ltd.* (7th Cir. 1998) 140 F.3d 716, 724 (*Kennedy*); *Geier v. Medtronic, Inc.* (7th Cir. 1996) 99 F.3d 238, 242 (*Geier*)).

According to Trop, after Thomas fired her, Thomas asked, "How could you possibly be my assistant and be pregnant? How did you think that ever was going to work?" When Trop said, "Women get pregnant every day," Thomas replied, "Well, that was never going to happen here. It would never happen here." For purposes of summary judgment consideration, the evidence of these statements discloses a discriminatory bias against pregnant employees that was "contemporaneous" with Trop's termination within the meaning of *Kennedy, supra,* 140 F.3d 716 and *Geier, supra,* 99 F.3d 238.

Trop also submitted sufficient evidence to raise a triable issue of fact as to whether Thomas, at the time she decided to terminate Trop, knew Trop was pregnant. Thomas claims she decided to fire Trop at the beginning of November 2002. Her claim is supported by her own deposition testimony and declaration, and the declarations of Tony Peyrot (Tall Trees Productions's business manager) and Jenno Topping (a producer for Tall Trees Productions). Yet, despite this purported decision to fire Trop, Thomas allowed Trop to take a vacation that Thomas viewed as unusually long, at a time—the end of December 2002 and beginning of January 2003—when Thomas claims she was particularly busy. Moreover, Thomas did not fire Trop in November. She fired her at the end of January 2003, nearly three months later. According to Thomas and Topping, Thomas's reasons for firing Trop included Trop's late return from her vacation, something that took place after Thomas claims she had already decided to fire Trop in November. Thus, the evidence of when Thomas decided to fire Trop is equivocal.

According to Trop, she told Thomas in October 2002 that she was trying to get pregnant. She also said that in December 2002, she suggested to Thomas that she was pregnant. Such evidence reasonably supports the conclusion that Thomas knew in October that Trop was trying to become pregnant and that she knew in December that Trop was pregnant, or at least that Trop believed she was pregnant. The suggestion may be subject to dispute, but at the summary judgment stage, all inferences should be viewed in favor of the party against whom the summary judgment motion is made. (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1520 [80 Cal.Rptr.2d 94].)

Defendants did not conclusively establish that Thomas decided to fire Trop in November 2002 and that she did not learn of Trop's pregnancy until after Trop's termination. Accordingly, the resolution of these facts is a matter for the finder of fact at trial. (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].)

Trop also raised a triable issue of fact as to whether the alleged reasons for her termination were pretexts for the termination. As noted above, defendants claim that Thomas decided to fire Trop at the beginning of November 2002. Yet according to Thomas and Topping, one of Thomas's reasons for firing Trop—Trop's late return from her vacation—occurred in January 2003. Also, even if Thomas's statements at Trop's termination are not direct evidence of discrimination, they constitute evidence of a "discriminatory animus" against pregnant employees and establish pretext. (*Morgan, supra,* 88 Cal.App.4th at p. 75.)

Trop's case may not appear strong. Nevertheless, I believe she has submitted enough evidence to have her case tried by a finder of fact—judge or jury.

Appellant's petition for review by the Supreme Court was denied August 24, 2005.