[No. D049614. Fourth Dist., Div. One. May 30, 2007.]

HESPERIA CITIZENS FOR RESPONSIBLE DEVELOPMENT, Plaintiff and Appellant, v.
CITY OF HESPERIA et al., Defendants and Respondents.

654

**COUNSEL**

C. Robert Ferguson for Plaintiff and Appellant.

Covington & Crowe, William A. Hauck and Robert E. Dougherty for Defendants and Respondents.

---

**OPINION**

**AARON, J.—**

### I.

### INTRODUCTION

Respondents City of Hesperia (City), City Council of the City of Hesperia (City Council), and the Hesperia Community Redevelopment Agency (Agency) entered into a municipal services agreement (MSA) with the Timbisha Shoshone Tribe (the Tribe). The purpose of the MSA was to govern the provision of municipal services to a gaming facility the Tribe was hoping to build within the City of Hesperia and within the Agency's redevelopment project area. Hesperia Citizens for Responsible Development (Citizens) filed a first amended complaint in which it alleged that respondents' adoption of the MSA was illegal, on various grounds. For example, Citizens claimed that the Agency's approval of the MSA violated Health and Safety Code[1] section 33426.5, which generally prohibits redevelopment agencies from assisting businesses in the development of gaming facilities. Respondents filed a motion for summary judgment in which they maintained that they had not violated section 33426.5, and that they were entitled to judgment on Citizens's other claims, as well. The trial court granted respondents' motion for summary judgment.

On appeal, Citizens claims that the trial court erred in granting respondents' motion for summary judgment. Citizens contends that the Agency's execution of the MSA violates section 33426.5. In addition, Citizens claims that respondents' adoption of the MSA violates the Community Redevelopment Law (§ 33000 et seq.) and constitutes an unlawful surrender of respondents' sovereign authority. We affirm the judgment.[2]

---

[1] Unless otherwise specified, all subsequent statutory references are to the Health and Safety Code.

[2] Although Citizens claimed in its first amended complaint that respondents had committed numerous other statutory and constitutional violations, Citizens's appeal in this court focuses exclusively on these three issues. Accordingly, we restrict our analysis to these three claims. Further, in light of our rejection of Citizens's claims and affirmance of the judgment, we need not consider respondents' various alternative grounds for affirming the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

In 1993, the City Council adopted ordinance No. 178, approving a redevelopment plan (Redevelopment Plan). Ordinance No. 178 noted that the Redevelopment Plan delineated an area within which redevelopment was authorized pursuant to the Community Redevelopment Law (the Project Area).

In 2002, the Tribe informed the City that it was interested in purchasing real property within the boundaries of Hesperia. The Tribe intended to have the land placed in trust by the United States Secretary of the Interior, for use by the Tribe to operate a casino. The Tribe indicated that it wanted the City to provide municipal services to the proposed development, including police, fire, water, and sewer services, after the land was taken into trust.

The City performed various analyses to determine the impact on the City of the proposed development, and ultimately reached an agreement with the Tribe concerning the provision of municipal services to the proposed development (the MSA). The MSA identified a proposed site for the casino, which is located within the boundaries of both Hesperia and the Project Area.[3] Pursuant to the MSA, the City agreed to provide police, fire, water and sewer services to the proposed development. The Tribe agreed to compensate the City for these services. On August 25, 2003, the City Council adopted resolution No. 2003-67, approving the MSA.

After adoption of resolution No. 2003-67, opponents of the casino project circulated a referendum petition that sought to have the City Council's determination overturned. Enough signatures were gathered to have the referendum placed on the ballot. A special election was held on March 2, 2004. The electorate upheld the City Council's approval of the MSA.

Title to the property on which the proposed development is to be constructed is currently held by a private owner. The property is vacant land. The Tribe has applied to the Secretary of the Interior to place the property in trust for the benefit of the Tribe.

---

[3] Although this fact is not expressly stated in respondents' statement of undisputed facts, it is not disputed by either party. Further, respondents' statement of undisputed facts provides, "When the land is place[d] in trust . . . it will be *removed* from the boundaries of the City of Hesperia and the Redevelopment Agency." (Italics added.)

## B. *Procedural background*

In May 2004, Citizens filed a first amended complaint/verified petition against respondents. In the first cause of action, Citizens claimed that respondents' adoption of resolution No. 2003-67 constitutes assistance to the Tribe in developing its gaming facility, and thus violates section 33426.5. In the second cause of action, Citizens claimed that respondents' adoption of resolution No. 2003-67 violated the Community Redevelopment Law for various reasons, including that the planned uses of the land as set forth in the MSA were unlawful. Citizens alleged in the third cause of action that resolution No. 2003-67 was invalid because the parcel of land on which the casino is to be built is not blighted. In the fourth cause of action, Citizens claimed that respondents' adoption of resolution No. 2003-67 violated California law in various ways, including that the development of a casino violates the prohibition on gambling contained in Penal Code section 330 and Business and Professions Code section 19800 et seq.

In the fifth and sixth causes of action, Citizens sought injunctive relief enjoining enforcement of resolution No. 2003-67, and a declaration that resolution No. 2003-67 is void. In the final cause of action, Citizens sought a writ of mandate prohibiting respondents from enforcing resolution No.2003-67.

Citizens filed a motion for summary adjudication and for summary judgment on the ground that respondents had violated section 33426.5. In addition, Citizens filed a motion for judgment on the pleadings in which it claimed that respondents had no defense to any of Citizens's claims, and that Citizens was entitled to judgment as a matter of law.

Respondents filed their own motion for summary judgment on various grounds, including that Citizens's action was preempted by federal law, and that respondents had not violated section 33426.5.

After further briefing and a hearing, the trial court denied Citizens's motion for summary judgment and motion for judgment on the pleadings, and granted respondents' motion for summary judgment. The court based its order granting respondents' motion for summary judgment on the following:

"1. That the Moving Defendants have met their initial burden of proof to establish that there is no triable issue as to any material fact and that the Moving Defendants are entitled to judgment as a matter of law;

"2. That no statutory basis exists for the filing of the Complaint;

"3. That the Municipal Services Agreement is preempted by the Indian Gaming Regulatory Act;

"4. That once the land is placed in trust by the Secretary of the Interior preemption will apply."

The trial court entered judgment in favor of respondents. Citizens timely appeals.

## III.

## DISCUSSION

### A. *Standard of review*

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) On appeal, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citations.]' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144], quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222–223 [38 Cal.Rptr.2d 35].) A trial court's ruling granting summary judgment may be affirmed on appeal if it is proper upon any theory of law applicable to the case. (*Farron v. City and County of San Francisco* (1989) 216 Cal.App.3d 1071, 1074 [265 Cal.Rptr. 317].)

### B. *The Agency did not violate section 33426.5*

Citizens claims the Agency violated section 33426.5 by adopting the MSA. There are no reported decisions construing section 33426.5. The scope of section 33426.5 is thus an issue of first impression.

#### 1. *The process of statutory interpretation*

"In construing any statute, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" (*Whaley v.*

*Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 484–485 [17 Cal.Rptr.3d 88].)

■ With respect to legislative history, "as a general rule in order to be cognizable . . . [it] must shed light on the collegial view of the Legislature *as a whole.* [Citation.]" (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520].) For example, " '[T]he statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a piece of legislation. [Citations.]' [Citation.]" (*Ibid.*)

### 2. *The text of the statute*

Section 33426.5 provides in relevant part:

"Notwithstanding the provisions of Sections 33391, 33430, 33433, and 33445, or any other provision of this part, an agency shall not provide any form of *direct assistance* to: [¶] . . . [¶]

"(c) A development or business, either *directly* or *indirectly*, for the acquisition, construction, improvement, rehabilitation, or replacement of property that is or would be used for gambling or gaming of any kind whatsoever including, but not limited to, casinos, gaming clubs, bingo operations, or any facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played.

"(d) The prohibition in subdivision (c) is not intended to prohibit a redevelopment agency from acquiring property on or in which an existing gambling enterprise is located, for the purpose of selling or leasing the property for uses other than gambling, provided that the agency acquires the property for fair market value." (Italics added.)

Notwithstanding the ambiguity created by the italicized language in the statute quoted above, we assume for purposes of this decision that section 33426.5 prohibits redevelopment agencies from providing either *direct* or *indirect* assistance to businesses in the development of gaming facilities. The legislative history clearly indicates that the Legislature intended to prohibit agencies from providing both direct and indirect assistance to such entities. (See, e.g., Legis. Counsel's Dig., Assem. Bill No. 2063 (1995–1996 Reg. Sess.) ["This bill would further prohibit a redevelopment agency from providing any form of *direct or indirect* assistance to a development or business" (italics added)]; Concurrence in Sen. Amends., Assem. Bill

No. 2063 (1995–1996 Reg. Sess.) as amended June 12, 1996, p. 1 (hereafter Concurrence in Senate Amendments) [stating that Senate amendments to Assem. Bill No. 2063 add a prohibition on "indirect assistance to gambling enterprises"].)

Section 33426.5 does not expressly define direct or indirect assistance. However, the use of the term "assistance" suggests that the Legislature intended to prohibit redevelopment agencies from affirmatively aiding businesses that are engaged in the development of gaming facilities. (See Webster's 3d New Internat. Dict. (1993) p. 132 [defining "assistance" as "the act or action of assisting," and defining "assist" as "to give support or aid"].)

Further, the context in which the term "assistance" is used in section 33426.5 suggests that the Legislature intended to prevent redevelopment agencies from using the powers granted to them by the Community Redevelopment Law to assist businesses in the development of gaming facilities. The opening paragraph of section 33426.5 provides, "Notwithstanding the provisions of Sections 33391, 33430, 33433, and 33445, or any other provision of this part, an agency shall not provide any form of direct assistance to . . . ."[4]

### 3. *The legislative history of section 33426.5*

The legislative history of section 33426.5 supports the conclusion that the Legislature intended to prevent redevelopment agencies from providing assistance to businesses engaged in developing gaming facilities. Section 33426.5 was initially adopted in 1994 to prohibit redevelopment agencies from using redevelopment powers to assist automobile dealerships and certain "big box" retailers. (Stats. 1993, ch. 942, § 25, p. 5364.) In 1996, the Legislature amended section 33426.5 to add the prohibition on assisting gaming enterprises. (Stats. 1996, ch. 136, § 1, p. 699.) The legislative history of the 1996 amendment describes this history:

"California's Community Redevelopment Law lets cities and counties create redevelopment agencies (RDA's) to improve 'blighted' project areas. RDA's use eminent domain, extraordinary land management powers, and tax increment financing—the difference between the property taxes generated before and after the improvement—to redevelop project areas.

---

[4] Section 33391 authorizes redevelopment agencies to acquire real property in various ways, including by purchase, lease, and eminent domain. Section 33430 provides that redevelopment agencies may dispose of property in various ways, including by sale or lease. Section 33433 provides requirements that govern the disposition of property acquired by tax increment financing. Section 33445 provides that redevelopment agencies may pay for publicly owned buildings. The term "this part" in section 33426.5 refers to the Community Redevelopment Law (§ 33000 et seq.).

"For decades, the Community Redevelopment Law has proved very lucrative for the communities that use its powers to attract and retain private investment, but very controversial with citizens, taxpayers, and businesses that must live under its powerful tools. In the last three decades, the Legislature has responded to RDA's' critics by enacting various reforms.

"In 1994, the Legislature passed a comprehensive redevelopment reform measure to refine the definition of 'blight,' standardize intergovernmental fiscal relationships, and limit agencies longevity ([Assem. Bill No.] 1290, Isenberg, 1994). As part of the 1994 reform, the Legislature banned the use of redevelopment funds for certain automobile [dealerships,] 'big box' retailers, and new city halls and county administration buildings, but grandfathered-in existing revenue pledges." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2063 (1995–1996 Reg. Sess.) as amended June 12, 1996, pp. 1–2 (hereafter Senate Analysis).)

The Senate Analysis also noted that two redevelopment agencies had been assisting gambling enterprises. The Senate Analysis characterized this assistance using the same language—"directly or indirectly"—that appears in section 33426.5:

"Two of the state's RDA's have recently been involved in assisting, *directly or indirectly*, gambling enterprises. In the 1980s, the City of Bell Gardens RDA (Los Angeles County) signed a 55-year lease with the Bicycle Club, a card casino, to use agency-owned land as a parking lot for $750,000 a year. More recently, the City of Palm Springs RDA (Riverside County) proposed to give land to an Indian tribe so that the tribe could establish a gambling casino downtown in conjunction with Caesar's. The RDA would have received two to three percent of the casino's profits. The Attorney General unsuccessfully sued the city, and the case is currently on appeal. Caesar's, however, has terminated its plans to participate in the casino." (Sen. Analysis, *supra*, at p. 2, italics added.)

This legislative history suggests that the Legislature intended to prohibit redevelopment agencies from providing assistance like the direct assistance (giving land) and indirect assistance (leasing land) discussed in these examples.

There are numerous other indications in the legislative history that suggest that the Legislature intended to prohibit redevelopment agencies from *subsidizing* gaming enterprises. (See Concurrence in Sen. Amends., *supra*, at p. 2 ["Proponents argue that redevelopment agencies should not subsidize gambling enterprises"]; Sen. Com. on Local Gov., analysis of Assem. Bill No. 2063 (1995–1996 Reg. Sess.) as amended June 12, 1996, pp. 2–3 ["After redevelopment agencies (RDAs) expressed an interest in promoting gambling

enterprises, state lawmakers grew concerned. Worried that gambling would promote blight instead of abate it, they want to prohibit RDAs from spending public money to promote gambling and gaming"]; Governor's Off. of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 2063 (1995–1996 Reg. Sess.) July 1, 1996, p. 4 (hereafter Enrolled Bill Report) ["proponents contended that gaming enterprises can establish themselves without redevelopment help"].)

In contrast, there is nothing in the legislative history to suggest that the Legislature intended to require redevelopment agencies to oppose any attempt by a business to establish a gaming enterprise within a redevelopment project area. Citizens relies on the following quotation from the Enrolled Bill Report: "*The author's staff* explained that [Assembly Bill No.] 2063 is being introduced to stop any future development and assistance of gambling enterprises in redevelopment project areas." (Enrolled Bill Report, *supra*, at p. 3, italics added.) However, the intention of the *bill author* in introducing the bill is not indicative of the *Legislature's* intent in passing the bill. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra*, 133 Cal.App.4th at p. 30.)

### 4. *The Agency did not provide direct or indirect assistance to a gaming entity in adopting the MSA[5]*

In support of its claim that the Agency violated section 33426.5, Citizens asserts that "the *MSA* provides direct assistance to the development of property inside the redevelopment Project Area which will be used for gambling or gaming." (Italics added.) Citizens notes that the opening paragraph of the MSA states the following: "This [MSA] is made . . . by and between the City of Hesperia (hereinafter 'the City,' which term shall include the City of Hesperia, Hesperia Community Redevelopment Agency, the Hesperia Water District, and the Hesperia Fire Protection District) and [the Tribe]." Citizens also notes that the MSA states that "the City" will provide various municipal services to the planned casino, including sewer and water service and police and fire protection.

Citizens further maintains that the Agency is taking an "active and direct role" in the casino project. Citizens supports this assertion by noting that the property for the proposed casino is located within the Project Area. Citizens also asserts that the Agency will forgo "controls" and "revenue" associated

---

[5] Citizens's statement of undisputed facts in support of its motion for summary judgment provides, "Resolution 2003 was adopted by Defendant Agency on August 25, 2003." Respondents agreed that this fact was undisputed. We assume for purposes of this decision that the City Council's action in adopting resolution No. 2003-67 constituted the Agency's approval of the MSA.

with the land to be used for the casino. With respect to revenue, Citizens argues that the Agency will forgo its right to receive tax increment revenues to which it would otherwise be entitled, when the land is taken into trust by the Tribe. (Cal. Const., art. XVI, § 16; Health & Saf. Code, § 33670 et seq.)[6] With respect to controls, Citizens argues that the Agency will lose its right to impose design and land use controls when the land is taken into trust for the Tribe.[7]

In its reply brief, Citizens contends that the "clearest form of assistance" in the MSA is its requirement that "the City" provide to the Secretary of the Interior correspondence in support of the Tribe's application to take the land for the casino in trust for the Tribe.

We reject each of Citizens's arguments that the Agency has violated section 33426.5. First, with respect to Citizens's argument that the MSA outlines the municipal services to be provided the planned casino, Citizens does not contend that the Agency itself will be responsible for providing such services. While Citizens notes that "the City" is defined in the opening paragraph of the MSA in such a way as to include the Agency, it is simply not reasonable to construe the MSA as requiring that the *Agency* provide the municipal services discussed therein, since it is undisputed that the Agency is not empowered to provide services such as water and sewer service or police and fire protection.

Section 33426.5 does not preclude the Agency from being a party to the MSA because the MSA requires that the City and other local governmental entities provide municipal services to the planned casino. Section 33426.5 evinces the Legislature's intent to preclude *redevelopment agencies* from assisting gaming entities. There is nothing in section 33426.5 that suggests that redevelopment agencies cannot be parties to contracts in which *other* governmental entities provide assistance to gaming entities.

Similarly, we reject Citizens's argument that the Agency's adoption of the MSA constitutes "assistance" within the meaning of section 33426.5 because it will result in a loss of "controls and revenue" associated with the land to be

---

[6] In *Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255 [145 Cal.Rptr. 886, 578 P.2d 133], the Supreme Court provided an overview of article XVI, section 16 of the California Constitution, which authorizes tax increment financing: "In essence this section provides that if, after a redevelopment project has been approved, the assessed valuation of taxable property in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project." (*Redevelopment Agency v. County of San Bernardino, supra*, 21 Cal.3d at p. 259, italics omitted.)

[7] Citizens offers this example in support of its argument that respondents violated the Community Redevelopment Law. (See pt. III.C., *post*.)

taken in trust for the benefit of the Tribe. As the MSA itself recognizes, any such loss of control or revenue is a function of the property becoming land held in trust for the Tribe, not a function of the MSA. For example, the MSA recites that without the MSA, "the City would not . . . have any authority or input with regard to the Tribe's trust lands . . . ." Similarly, the MSA provides, "The Tribe and the City agree that . . . the City will lose potential tax revenues from the land and the improvements thereon and from certain commercial activities that the Tribe may conduct on the Trust lands."

We also reject Citizens's argument that the MSA's provision that the City will provide correspondence in support of the Tribe's application to take the land in trust constitutes the assistance that section 33426.5 prohibits. Section 21 of the MSA provides that "the City shall provide the correspondence attached as Exhibit D to the United States Department of Interior, Bureau of Indian Affairs . . . ." Exhibit D is a letter from the Mayor of the City of Hesperia that states, "It is with great pleasure that I, *on behalf of the City Council of the City of Hesperia*, California, submit this letter supporting the [Tribe's] request to take land into Trust." Thus, notwithstanding the MSA's definition of "the City," it is not reasonable to construe section 21 of the MSA as requiring the *Agency* to support the Tribe's application.

█ Accordingly, we conclude that the Agency did not provide direct or indirect assistance to a gaming entity in adopting the MSA and thus, that the Agency did not violate section 33426.5.

## C. *Respondents did not violate the Community Redevelopment Law*

Citizens claims respondents violated the Community Redevelopment Law in adopting the MSA.[8]

Citizens's primary argument in support of this claim is that the MSA does not contain adequate assurances from the Tribe that it will use the land to be taken in trust for the proposed casino in a manner consistent with the Community Redevelopment Law. Citizens argues that the Agency could have insisted that the "Tribe . . . make certain concessions" in order to gain the Agency's approval of the MSA. Citizens also faults the Agency for failing to insist that provisions be included in the MSA that would mandate compliance with the Community Redevelopment Law's policy regarding nondiscrimination (§ 33050) and the requirement that 20 percent of tax increment funds paid to a redevelopment agency be used for low-income housing (§ 33487).

---

[8] Citizens states in its brief that its action "does not challenge the project or the construction of the casino." Therefore, we consider only whether respondents' adoption of the MSA violates the Community Redevelopment Law, and do not address whether the casino project is compatible with the Agency's redevelopment plan.

Similarly, Citizens argues that the Agency could have demanded that the MSA incorporate a provision of the Redevelopment Plan that governs design restrictions on developments in the Project Area. This argument fails because Citizens has not identified any obligation in the Community Redevelopment Law that requires the Agency to insist on such terms for all developments occurring within a redevelopment area.

 Citizens also argues that the site of the proposed casino is not blighted. (§ 33030.) Not every property within a redevelopment area need be blighted. (§ 33321 ["A project area need not be restricted to buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area"].) More importantly, the City Council's prior determinations of blight in adopting the 1993 Redevelopment Plan and a 1999 amendment to the Redevelopment Plan are conclusive. (§ 33368 [providing that in the absence of a validation action, "[t]he decision of the legislative body shall be final and conclusive, and it shall thereafter be conclusively presumed that the project area is a blighted area as defined by Section 33031 and that all prior proceedings have been duly and regularly taken"].)

Finally, Citizens broadly argues that gambling is not consistent with the "general welfare" (§ 33020), and that a casino will not provide "an environment for the social, economic, and psychological growth and well-being of all citizens." (§ 33071.) Such arguments go to the merits of the underlying project and the compatibility of the project with the Redevelopment Plan. Citizens expressly states that this lawsuit does not address those issues. (See fn. 8, *ante*.) Accordingly, we reject this argument.

We conclude that respondents did not violate the Community Redevelopment Law in adopting the MSA in the ways Citizens claims.

D. *Respondents did not unlawfully relinquish their sovereign authority by adopting the MSA*

Citizens claims that respondents unlawfully relinquished their sovereign authority by adopting the MSA. The gist of this claim is that, "once the property is put in trust for the Tribe," the property will no longer be subject to state law or local ordinances. We reject this argument. As Citizens's argument implicitly acknowledges, any preemption of state law and local ordinances on land that comes to be held in trust for the tribe is a function of federal law, not the MSA. (See generally *Artichoke Joe's California Grand Casino v. Norton* (9th Cir. 2003) 353 F.3d 712, 715 [providing a history of Indian gaming in California].)

## IV.

## DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Nares, J., concurred.