71 Cal.Rptr.3d 386 (2008)
159 Cal.App.4th 90
Yvonne HAMMOND, Plaintiff and Appellant,
v.
COUNTY OF LOS ANGELES, Betty Brennan, Defendants and Respondents.
No. B189262.
Court of Appeal of California, Second District, Division Five.
January 18, 2008.
*389 Stephan A. Ebner and Kevin C. Boyle, for Plaintiff and Appellant.
Office of the County Counsel, Raymond J. Fortner, Jr., County Counsel, Ralph L. Rosato, Assistant County Counsel, Doraine F. Meyer, Principal Deputy County Counsel, and Donna B. Koch, Principal Deputy County Counsel, for Defendants and Respondents.
CERTIFIED FOR PARTIAL PUBLICATION.[*]
MOSK, J.

INTRODUCTION
Plaintiff and appellant Yvonne Hammond (plaintiff), a nursing instructor employed by the Los Angeles County Sheriffs Department (Department) sued her employer, defendant and respondent County of Los Angeles (County), alleging five violations of the Fair Employment and Housing Act (the FEHA).[1] Plaintiff also sued her supervisor, Betty Brennan (Brennan), alleging two causes of action for racial harassment and retaliation in violation of the FEHA. The County and Brennan successfully moved the trial court for an order granting summary judgment, and *390 plaintiff appeals from the judgment entered based on that order.
In the published portion of this opinion, we hold that there is a triable issue of one or more material facts as to whether one year after the filing of plaintiffs administrative complaint with the Department of Fair Employment and Housing (the DFEH)the period of limitationsshe continued to experience an adverse employment activity so as to defeat the statute of limitations defense. We further hold that plaintiff has raised a triable issue of one or more material facts with respect to her claims for race discrimination, harassment based on race, age discrimination, and retaliation, all in violation of the FEHA.
As we discuss in the unpublished portion of the opinion, Brennan is not immune from individual liability under section 820.2, and the trial court properly granted the County's motion for summary adjudication as to the third cause of action against the County for failing to take reasonable steps to prevent discrimination or harassment.

FACTS[2]

A. Plaintiffs Facts
From approximately October 1996, the Department employed plaintiff as a nursing instructor in the Medical Staff Development Unit (MSD Unit). She was a credentialed teacher with five years of service as a nursing instructor in the MSD Unit and 18 years of total service with the County.
In late 2001, Brennan was assigned to "Twin Towers II" as the new supervisor of the MSD Unit.[3] Before Brennan arrived, plaintiff taught seven to ten classes per month. Her teaching assignments amounted to 25 to 30 hours weekly. Shortly after Brennan was assigned to the MSD Unit, she asked plaintiff to "demote." Plaintiff Understood that request to mean that Brennan wanted her to accept a position as a staff nurse. A staff nurse earns less salary than a nursing instructor.
In February or March 2002, Brennan removed plaintiff from the classroom. Plaintiff was 62 years old at the time. Plaintiff testified, "[I]t wasn't long before she told me I couldn't stay in the classroom because I was too old." Plaintiff described the conversation as follows: "[S]he didn't want me in the classroom anymore because I was an old instructor and these were new people and young people and they needed experience. I was an old experienced instructor and I needed to get out of the classroom and let them have a chance." Plaintiff further testified that, "[Brennan] told me she didn't want me to teach anymore, she wanted me out of the classroom because I was too old, [Brennan] wanted young people in the classroom, and from there I just sat all day in the office doing nothing." Brennan hired younger staff nurses to teach classes that had been previously assigned to plaintiff. According to plaintiff, once she was no longer teaching in the classroom, she was doing "[n]othing, just sitting." It was not that plaintiff was being prevented from teaching the number of classes she *391 thought she deservedshe "didn't get any" classes to teach. She said, "they didn't let me teach anymore." Ultimately, she "couldn't take sitting there doing nothing." Plaintiffs repeated testimony about "doing nothing" supports a reasonable inference that she was subjected to more than the mere redistribution of the work-load among plaintiff and the new employees. Thus, plaintiff disputed Brennan's assertion that the work was divided equally among the staff.
Plaintiffs testimony about the reduction in her teaching assignments was corroborated by a fellow nursing instructor, Joel Reta (Reta). According to Reta, he "witnessed [Brennan] treating [plaintiff] in an inappropriate manner. [Brennan] had a condescending attitude towards her and also began taking classes away from her, while giving [him] and other instructors more responsibility."
In addition to plaintiffs testimony that her teaching assignments were reduced shortly after Brennan took over supervision of the MSD Unit, the Department's own records, which are not controverted, show that plaintiff taught no classes from February 14 to November 6, 2002, when she taught a spinal injury class. Those records reflect that after the November 6, 2002, class, she taught classes on December 10, 2002, January 23, March 21, April 8 and 17, May 22, July 28, and December 11, 2003. After February 2002, plaintiff was never given a teaching assignment schedule comparable to her pre-February 2002 teaching schedule. Thus, after July 1, 2003the date from which defendants claim the period of limitations began plaintiff taught classes only on July 28 and December 11, 2003. In the middle of 2004, however, a new nursing director, Helen Johnson, directed that plaintiff be given additional teaching assignments. Plaintiff then began to teach 12 to 20 hours per weekstill not as many hours per week as she had taught before the arrival of Brennanseven to ten classes per week or about 25-30 hours weekly. When plaintiff was allowed to teach, Brennan monitored her classroom performance, but not the performance of the other three nursing instructors.
Plaintiff was the only African-American among the four instructors in the MSD Unit. Brennan made derogatory remarks to plaintiff and in plaintiffs presence about certain African-American employees. Examples of those remarks include, "They don't know anythingThey['re] dumb.... They didn't have any sense, they were dumb." According to plaintiff, Brennan made such remarks about Dr. Hart, Dr. Clark, and Stella Jackson, a nurse manager. Moreover, while observing plaintiff in the classroom, Brennan stated to Reta, "that she didn't understand [plaintiff] because [plaintiff] was probably speaking `Ebonics.'"
In mid-2002, plaintiff met with Captain Richard Barrantes, Brennan's direct supervisor. Plaintiff told him that Brennan was a "racist," and was taking away her teaching assignments.
In apparent response to plaintiff's complaint to Captain Barrantes, Brennan met with plaintiff on August 27, 2002, and proceeded to tell plaintiff in an agitated manner, "Nobody screws me!I will screw you back!I [won't] forget you and Captain Barrantes can kiss my ass!" Brennan then took plaintiff to meet with Thomas Flaherty, another nursing director. During that meeting, Brennan complained to Flaherty about plaintiffs teaching methods. Flaherty replied that Brennan "should have told [plaintiff] what [Brennan] wanted." Plaintiff told Flaherty that Brennan "couldn't tell me what she wanted because she didn't communicate with me, she didn't even talk to me, she didn't even *392 speak to me and she treated me very cold."
On October 23, 2003, plaintiff complained to Captain Rodney Penner, another supervisor, regarding the treatment she was enduring. Captain Penner admitted that Brennan told him that "[s]he [plaintiff] was concerned that she had had teaching responsibilities taken away from her. She expressed her concern and opinion that she felt that her supervisor or manager was racially prejudiced against African-American employees. She felt she was being unjustly treated because she was one of the few non-Filipino employees assigned to the [MSD] Unit." Captain Penner prepared a form regarding plaintiff's complaint. In the form, Captain Penner recorded the following: "Upon Ms. Brennan assuming managerial responsibility of the unit in 2001, Brennan told [plaintiff] that she was going to have to leave the unit and demote.... Upon her [plaintiffs] refusal to demote and leave the unit, [plaintiff] said she became subjected to ongoing harassment and discrimination by Brennan. [Plaintiff] said that virtually all her duties and responsibilities have been stripped from her, and that she is excluded from meetings with other staff members.... [Plaintiff] believes that Brennan is racially prejudiced against African-American employees, as she has openly described specific (African-American) employees by name, as `dumb.'"
Plaintiffs complaint to Captain Penner was investigated by the Intake Specialist Unit (ISU), the unit within the Department that had the responsibility for investigating claims of discrimination. The ISU was created pursuant to the Department's "Policy of Equity" to receive and process complaints related to that policy.
On June 8, 2004, the Department issued a letter to plaintiff that stated, "This is a final acknowledgement of your complaint of October 22, 2003, wherein you complained about the actions of Ms. Betty Brennan. [¶] In summary you alleged that from approximately October 22, 2001 through October 2003,' your supervisor, Ms. Betty Brennan, acted inappropriately toward you and treated you differently than other employees. [¶] An investigation and subsequent review by the Department's Equity Oversight Panel has established that your allegations are founded. Please be advised that appropriate administrative action has been taken."[4] (Italics added.) Plaintiff filed a complaint with the DFEH on July 1, 2004. She received a right to sue letter from the DFEH on July 13, 2004. (§ 12960; 12965, subd. (b).)

B. Defendant's Facts
Defendant submitted evidence that plaintiff never applied for any promotions; she never received a reduction in pay after additional nurse instructors were hired; Brennan divided the teaching assignments among all the instructors, including plaintiff, equally; all the instructors were monitored on a random basis; and no consideration was given to age, race, seniority, or sex.
Brennan stated in her declaration: "Based upon my recollection and my review of an assignment plan sheet I wrote for the nursing instructors for the 2002/2003 time frame, I assigned approximately an equal amount of work to the four nursing instructors in my unit. [¶] ... [¶] I am familiar with plaintiffs allegation that she `had nothing to do but stare at the computer, at the walls, and at the phone all day.' This statement is not supported by her annual performance evaluations, by my recollection, or by various *393 other documents...." That testimony suggests that, contrary to plaintiffs assertion, Brennan did not take away the majority of plaintiffs teaching assignments and give them to the three other instructors who were not African-Americana denial rather than an explanation of plaintiff's claim of a reduction in assignments.
Brennan also stated in her declaration: "It was my practice throughout my tenure as [supervisor of the MSD Unit] to monitor the classes taught by nursing instructors by sitting in on their classes on a random basis. I attended, at least in part, classes taught by each of the nursing instructors assigned to any unit in each of the subjects for which they were responsible. [¶] It was also the practice of my subordinate ... to monitor the classes of each of the nursing instructors on a random basis. [¶] Neither my monitoring of the classes, nor that of [my subordinate], was done for the purpose of harassment of the instructors, but rather to improve the quality of the instruction our unit provided to nursing staff." (Italics added.) That testimony suggests that, contrary to plaintiffs assertion, Brennan did not constantly monitor plaintiff's performancea denial rather than an explanation of plaintiffs claim of excessive monitoring.

PROCEDURAL BACKGROUND

A. Complaint
Plaintiff filed a complaint in the trial court against the County asserting five causes of action under the FEHA for "Race Discrimination," "Harassment Based on Race," "Violation of Government Code section 12940(k)," "Age Discrimination," and "Retaliation." The first cause of action for race discrimination, the third cause of action for violation of section 12940, subdivision (k), and the fourth cause of action for age discrimination were asserted only against the County. The second cause of action for harassment and the fifth cause of action for retaliation were asserted against both the County and Brennan.
In the complaint, plaintiff alleged, inter alia, that defendants took away virtually all her teaching assignments because of her age and race, and retaliated against her when she complained. Plaintiff also asserted other conduct by defendants in support of her FEHA claims, such as her relocation to Men's Central Jail.

B. Summary Judgment Motion
Defendants moved for summary judgment and summary adjudication as to each cause of action, raising specific contentions as to each. As to the race and age discrimination and racial harassment claims, defendants asserted that they were time-barred because they were based on "acts that occurred prior to July 1, 2003." As to the claims based on race and age discrimination and retaliation, defendants asserted that "plaintiff cannot establish a prima facie case." According to defendants, plaintiff did not show that she suffered an adverse employment action. As to the racial harassment claim, defendants argued that plaintiff had failed to establish that their conduct was "severe and pervasive" so as to be considered actionable. (See Etter v. Veriflo Corp. (1998) 67 Cal. App.4th 457, 465, 79 Cal.Rptr.2d 33.)
As discussed above, Brennan denied she had reduced plaintiffs teaching assignments or had monitored only plaintiffs classroom performance. Defendants did not give any nondiscriminatory reason for plaintiffs reduction in teaching assignments or the alleged monitoring of plaintiff. Instead, defendants took the position there was no such reduction or monitoring of only plaintiff.
*394 Plaintiff opposed the motions based on, inter alia, the evidence set forth above. After a hearing, the trial court issued an order granting defendants' motion for summary judgment.

C. Reconsideration and Evidentiary Rulings
Plaintiff filed a motion for reconsideration based on the California Supreme Court's then-recent decision in Yanowitz v. L'Oreal USA Inc. (2005) 36 Cal.4th 1028, 32 Cal.Rptr.3d 436, 116 P.3d 1123 (Yanowitz). On its own motion, the trial court determined that it should reconsider its order granting summary judgment in light of Yanowitz and set a hearing.
At the second hearing on defendants' motions, the trial court sustained the County's written objection to the admission in evidence of the June 8, 2004, letter from the Department to plaintiff informing her that her complaint to Captain Penner had been investigated and her allegations were deemed "founded." That letter had been an exhibit to Captain Penner's deposition. The trial court concluded that the letter was inadmissible, not as a matter of discretion, but under the legal premise that Penal Code section 832.7[5] applied. On appeal, plaintiff refers to and relies upon this June 8, 2004, letter.
We determine that the letter is part of the evidentiary record on appeal and that the trial court erred in excluding the letter from evidence. It was admissible, inter alia, as an admission by an authorized party representative (Evid.Code, § 1222; see Evid.Code, § 1280 [record by public employee]) and was not subject to Penal Code section 832.7. There are a number of reasons why, based on the evidence before the trial court, Penal Code section 832.7 was not applicable here. The letter was not part of or, information from, a personnel record, nor did it concern a "peace officer or custodial officer." (See Pen.Code, §§ 7, 830, 830.1, 831.5.) Penal Code section 832.7 does not appear to apply to a nurse or teacher. Moreover, it is not a record maintained pursuant to Penal Code section 832.5, as that section applies to "complaints by members of the public." The reference to "complaining party" in Penal Code section 832.7 is governed by the term "complaints by members of the public" in Penal Code section 832.5.
The County also orally objected to the declaration of Reta, another nursing instructor. "[County Counsel]: I do have an objection as I had filed previously with the motion for summary judgment. Before reconsideration was granted, it's the same objection to the declaration of Reta because there is no personal knowledge under oath so the sameI'd like to renew the objection. The Court: As to Joel Reta, anything that is hearsay, of course, the court will not consider hearsay but his own personal knowledge and observations, whatever he stated, the court does consider." The trial court did not rule on a specific objection to that portion of Reta's declaration dealing with Brennan's "Ebonics" comment, and therefore we consider that portion of the declaration to be part of the record. (Ann M. v. Pacific Plaza Shopping Center (1993) 6 Cal.4th 666, 670, fn. 1, 25 Cal.Rptr.2d 137, 863 P.2d 207; Demps v. San Francisco Housing Authority *395 (2007) 149 Cal.App.4th 564, 566, 57 Cal.Rptr.3d 204; Laird v. Capital Cities/ABC, Inc. (1998) 68 Cal.App.4th 727, 736, 80 Cal.Rptr.2d 454.)
After hearing oral argument, the trial court issued an order again granting the defendants' motions for summary judgment as to all causes of action. The trial court entered judgment on its order granting summary judgment.
This appeal followed.

DISCUSSION

A. Standard of Review
"We review the grant of summary judgment de novo. (Szadolci v. Hollywood Park Operating Co. (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].) We make `an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' (Iverson v. Muroc Unified School Dist. (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].) A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has made such a showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 849, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (Moser v. Ratinoff (2003) 105 Cal.App.4th 1211, 1216-1217, 130 Cal. Rptr.2d 198.)
"In performing our de novo review, we view the evidence in the light most favorable to plaintiffs as the losing parties. [Citation.] In this case, we liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (Wiener v. Southcoast Childcare Centers, Inc. (2004) 32 Cal.4th 1138, 1142, 12 Cal. Rptr.3d 615, 88 P.3d 517:) As stated in Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 334, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (Guz), an employment discrimination case, "Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiffs case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." "Summary judgment is a severe remedy which is to be granted with caution." (Paper Savers, Inc. v. Nacsa (1996) 51 Cal.App.4th 1090, 1094, 59 Cal.Rptr.2d 547.)

B. THE FEHA

1. Prohibited Practices
Section 12940, subdivision (a) provides in pertinent part that it is an unlawful employment practice for an "employer, because of the race ... [or] ... age ... of any person ... to discriminate against the person in compensation or in terms, conditions, or privileges of employment." "[T]he determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate *396 interests of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [Government Code] section 12940(a)...." (Yanowitz, supra, 36 Cal.4th at pp. 1054-1055, 32 Cal.Rptr.3d 436, 116 P.3d 1123.)
In addition, the FEHA prohibits an employer from harassing an employ on the basis of race or other factors. (§ 12940, subd. (j)(1); see Cal.Code Regs., tit. 2, § 7287.6, subd. (b)(1).) The FEHA also provides that it can be an "unlawful employment practice" for "any employer ... or person to ... discriminate against any person because the person has opposed any practices forbidden under this part or has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h); see Cal.Code Regs., tit. 2, § 7287.8, subd. (a).) "Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (Miller v. Dept. of Corrections (2005) 36 Cal.4th 446, 472, 472, 30 Cal.Rptr.3d 797, 115 P.3d 77 (Miller).)
In Taylor v. City of Los Angeles Dept. of Water & Power (2006) 144 Cal. App.4th 1216, 1231-1233, 51 Cal.Rptr.3d 206 (Taylor), the court explained that Yanowitz, supra, 36 Cal.4th 1028, 32 Cal. Rptr.3d 436, 116 P.3d 1123, had adopted a "materiality test" for determining whether an employment action is "adverse" for purposes of the FEHA. "[T]he proper standard for defining an adverse employment action is the materiality test, a standard that requires an employer's adverse action to materially affect the terms and conditions of employment. (Yanowitz, supra, 36 Cal.4th at pp. 1036, 1050[, 32 Cal. Rptr.3d 436, 116 P.3d 1123]; see Akers v. County of San Diego [(2002) ] 95 Cal. App.4th [1441,] 1454-1457[, 116 Cal. Rptr.2d 602].)" (Ibid.) In Jones v. Lodge at Torrey Pines Partnership (2007) 147 Cal.App.4th 475, 54 Cal.Rptr.3d 379, the court further explained that in determining whether, a plaintiff has suffered an adverse employment action under Yanowitz, "it was appropriate to consider the alleged retaliatory acts against the plaintiff `collectively under a totality-of-the circumstances approach.'" (Id. at p. 499, 54 Cal.Rptr.3d 379.)

2. Burden Shifting
California "has adopted the three-stage burden shifting test established by the United States Supreme Court for trying claims of discrimination ... based on a theory of disparate treatment. [Citations.] [¶] This so-called McDonnell Douglas[6] test reflects the principle that direct evidence of intentional discrimination is rare and that such claims must usually be proved circumstantially." (Guz, supra, 24 Cal.4th at p. 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) The McDonnell Douglas test is therefore used when there is not direct evidence of discrimination. *397 (Trop v. Sony Pictures Entertainment, Inc. (2005) 129 Cal.App.4th 1133, 1144, 29 Cal.Rptr.3d 144.) Under the McDonnell Douglas test, the initial burden of coming forward and proving a prima facie case of discrimination is on the plaintiff. (Ibid.) "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position sought or was performing competently in the position he held, (3) he suffered an adverse employment action, and (4) some other circumstance suggests a discriminatory motive." (Id. at p. 355, 8 P.3d 1089.) If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises. (Ibid.)
Upon a showing of a prima facie case by the plaintiff, "the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to `raise [ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [¶] If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or offer other evidence of a discriminatory motive." (Guz, supra, 24 Cal.4th at pp. 355-356, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (Id. at p. 356, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)

C. Statute of Limitations
Defendants contend plaintiffs claims under the FEHA for acts of discrimination, harassment, and retaliation that occurred prior to July 1, 2003more than one year prior to the July 1, 2004,[7] filing of plaintiffs administrative complaint with the DFEHare barred under the one-year limitations period in section 12960, subdivision (d).[8] Plaintiff asserts that the continuing violation doctrine[9] applies and entitles her to rely on discriminatory conduct that occurred prior to July 1, 2003, regardless of the statute of limitations. Plaintiff also argues that even if the continuing violation doctrine does not apply, actionable conduct took place within the limitations period in section 12960, subdivision (d).
We do not need to determine whether the continuing violation doctrine applies because plaintiff has submitted evidence that within the one-year limitations period actionable conduct occurred. That evidence shows, inter alia, that the alleged actionable conductreduction in plaintiffs classroom teaching assignmentsbegan in early 2002 and continued after July 1, 2003.
*398 "Our courts frequently turn to federal authorities interpreting Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII) for assistance in interpreting the FEHA and its prohibition against sexual harassment. (See Aguilar v. Avis Rent A Car System, Inc. [ (1999) ] 21 Cal.4th [121,] 129-130[, 87 Cal.Rptr.2d 132, 980 P.2d 846]; Beyda v. City of Los Angeles [(1998)] 65 Cal.App.4th [511,] 517[, 76 Cal.Rptr.2d 547].)" (Miller, supra, 36 Cal.4th at p. 463, 30 Cal.Rptr.3d 797, 115 P.3d 77; see Richards v. CH2M Hill, Inc. (2001) 26 Cal.4th 798, 812, 111 Cal.Rptr.2d 87, 29 P.3d 175 (Richards).) In National Railroad Passenger Corporation v. Morgan (2002) 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (Morgan), which arose under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., the United States Supreme Court held that an act within the limitations period in furtherance of racial discrimination or retaliation is a discrete act that is not barred by the statute of limitations, and that evidence of conduct outside the limitations period is admissible as "relevant background evidence" to show, inter alia, a prohibited motivation for the discrete act. (Morgan, supra, 536 U.S. at p. 112, 122 S.Ct. 2061.) According to the court in Morgan, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim." (Id. at p. 113, 122 S.Ct. 2061, italics added.)
"[F]ollowing the guidance" of federal law (Miller, supra, 36 Cal.4th at p. 466, 30 Cal.Rptr.3d 797, 115 P.3d 77), we apply the Morgan `methodology here. Under this approach, Brennan's decisions concerning the number and type of teaching assignments that plaintiff received from and after July 1, 2003alleged adverse employment actionscan be attributed to plaintiffs race and age based on the statements and acts that took place before July of 2003. Therefore, her FEHA claims based on acts that occurred within the limitations period are not barred by section 12960, subdivision (d).
The reasoning of the recent United States Supreme Court decision in Ledbetter v. Goodyear Tire & Rubber Co., Inc. (2007) 550 U.S. ___, 127 S.Ct. 2162, 167 L.Ed.2d 982 (Ledbetter), does not change our conclusion. Ledbetter distinguishes for statute of limitations purposes between discriminatory acts occurring within the limitations period and discriminatory acts occurring outside the period that may have residual adverse effects upon the employee within the period. In Ledbetter, the employee claimed that during the course of her employment, her supervisors gave her poor performance evaluations based on her sexa violation of Title VII[10]  which evaluation resulted in her pay not increasing as it would have if she had been evaluated fairly. (Ledbetter, supra, 550 U.S. at p. ___, 127 S.Ct. at pp. 2165-2166.) According *399 to the plaintiff in Ledbetter, those past evaluations, each of which occurred outside the limitations period, decreased the level of her pay then and throughout her subsequent employment, so that by the time she retired, she was earning significantly less than her male colleagues. (Ibid.) The jury found for the plaintiff on her Title VII pay discrimination claim and awarded her backpay and damages. (Id. at p. 2166.)
On appeal, the employer contended that the plaintiffs pay discrimination claim was time-barred with respect to all pay decisions made outside the limitations period. The employer also argued that no discriminatory act relating to the plaintiffs pay occurred within the limitations period. (Ledbetter, supra, 550 U.S. at p. ___, 127 S.Ct. at p. 2166.) The Court of Appeals reversed, holding that a Title VII pay discrimination claim cannot be based on any discriminatory pay decision that occurred outside the limitations period even though that decision affected nondiscriminatory pay decisions within the limitations periodthe EEOC charging period. (Ibid.) The Court of Appeal held that there was insufficient evidence to prove that the employer had acted with discriminatory intent in making the only two pay decisions that occurred within the limitations period. (Ibid.)
In affirming the decision of the Court of Appeals, the Supreme Court emphasized that "[i]n addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. Morgan, 536 U.S., at 110-111, 122 S.Ct. 2061, 153 L.Ed.2d 106." (Ledbetter, supra, 550 U.S. at p.___, 127 S.Ct. at p. 2167.) "In Morgan, we explained that the statutory term `employment practice' generally refers to `a discrete act or single "occurrence"' that takes place at a particular point in time. 536 U.S., at 110-111, 122 S.Ct. 2061, 153 L.Ed.2d 106. We pointed to `termination, failure to promote, denial of transfer, [and] refusal to hire' as examples of such `discrete' acts, and we held that a Title VII plaintiff `can only file a charge to cover discrete acts that "occurred" within the appropriate time period.' Id, at 114, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106." (Id. at 2169.) The Supreme Court stated, "The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See Morgan, supra, at 113, 122 S.Ct. 2061, 153 L.Ed.2d 10." (Ibid., italics added.)
Thus, according to Ledbetter, supra, 550 U.S. ____, 127 S.Ct. 2162, 167 L.Ed.2d 982, even though a prior discriminatory evaluation and pay adjustment continue to have negative effects on an employee's pay throughout her employment, the cause of action accrues at the time the evaluation and pay adjustment are made, when the employer acted in a discriminatory manner with adverse consequences for the employee. "Generally, a cause of action accrues for purposes of the statute of limitations, and the applicable limitations period begins to run, when the plaintiff has suffered damages from a wrongful act." (Lyles v. State of California (2007) 153 Cal.App.4th 281, 286, 62 Cal.Rptr.3d 696.) Once the damage is such that the cause of action accrues, additional damage from the same wrong does not alter the accrual of the cause of action or otherwise extend the limitations period. (Id. at p. 290, 62 Cal. Rptr.3d 696 [inverse condemnation action]; *400 see also Dairies v. Krasna (1975) 14 Cal.3d 502, 514, 121 Cal.Rptr. 705, 535 P.2d 1161 ["neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations"].)
In this case, unlike Ledbetter, supra, 550 U.S. ____, 127 S.Ct. 2162, plaintiffs evidence supports a reasonable inference that Brennan engaged in actssome within the limitations periodeach of which was intentionally discriminatory. According to plaintiff, beginning around February 2002, Brennan made periodic decisions about the number and type of classes that plaintiff would be assigned to teach. The Department's records show that initially Brennan gave no assignments to plaintiff from approximately February through October 2002. Thereafter, Brennan gave assignments to plaintiff, but they were sporadic and rarely did plaintiff receive more than one teaching assignment a monthfar fewer classes than she had taught before Brennan reduced plaintiff's teaching schedule. After July 1, 2003, those records reflect that plaintiff taught a class on July 28, 2003, and again on December 11, 2003. It was not until the middle of 2004, after Brennan was replaced with a new nursing director, that plaintiff began to teach 12 to 20 hours weekly.
In Ledbetter, supra, 550 U.S. ____, 127 S.Ct. 2162, intentional acts of sex discriminationpoor performance reviewsoccurred outside the limitations period, but caused an adverse ripple effect on the plaintiffs pay throughout her tenure with the defendant company. The later payments within the limitations period were not based on any discriminatory evaluation or decision, even though affected by the earlier discriminatory acts outside the limitations period. Thus, Ledbetter, a pay discrimination case, was based on acts of discrimination by a supervisor outside the limitations period that adversely affected the employer's nondiscriminatory pay decisions within the period. As a result, the rationale of Ledbetter has no application to a case such as this one in which plaintiffs evidence shows discrete acts of discrimination both inside and outside the limitations period. Here, plaintiffs evidence supports a separate cause of action accruing within the limitations period in connection with the discrete acts during that period.
Unlike the supervisors in Ledbetter, supra, 550 U.S. ____, 127 S.Ct. 2162, Brennan did not just make a single decision based on age or race outside the limitations period that continued to affect plaintiff adversely during the limitations periodsuch as, for example, demoting plaintiff to a staff nurse or permanently removing her from the classroom. Instead, Brennan initially removed plaintiff from the classroom in early 2002, but then allowed her to teach classes on a sporadic basis beginning in late 2002 and continuing through July 1, 2003. Thus, if Brennan's initial decision to remove plaintiff from the classroom was tainted by a prohibited motive under the FEHA, a reasonable fact-finder could infer that Brennan's subsequent decisions concerning plaintiffs teaching assignments within the limitations period were similarly motivated.
Plaintiff has submitted evidence of statements and actions prior to July 2003 suggesting that the reduction in her classroom teaching assignments was based on age and race. These included statements by Brennan that plaintiff's teaching assignments were being eliminated because of age and other statements disparaging employees based on their race. But after July 2003, i.e., within the limitations period, there is evidence that Brennan continued to limit the number and types of teaching assignments that plaintiff would receive. In doing so, Brennan made discrete decisions concerning plaintiffs workload *401 within the limitations period, each of which was arguably a fresh violation of the FEHA. Thus, even if the analysis of Ledbetter, supra, 550 U.S. ___, 127 S.Ct. 2162, 167 L.Ed.2d 982 applies to FEHA cases, plaintiff has raised a triable issue of fact concerning whether an actionable adverse employment action under the FEHA (Yanowitz, supra 36 Cal.4th at pp. 1054-1055, 32 Cal.Rptr.3d 436, 116 P.3d 1123) occurred within the limitations period.

D. There Is a Triable Issue of One or More Material Facts Concerning Plaintiffs First Cause of Action for Race Discrimination
In-connection with her prima facie case on her race discrimination claim, plaintiff provided evidence that she is African-American, she had been teaching a number of nursing classes in the MSD Unit for five years for the County, she was relieved of her assignments sometime after Brennan arrived, and she continued to have a substantially reduced teaching schedule thereafter. To show that the actions against her were a result, in part, of racial animus, plaintiff provided evidence of race-based comments by Brennan and differential treatment based on race by Brennan. The County did not assert that plaintiffs job performance was a justification for its actions, but rather contended there was no adverse employment action within the limitations period.[11]

1. Adverse Employment Action
The County contends that plaintiff cannot make the required prima facie showing of race discrimination because she has insufficient evidence that she suffered an adverse employment action. According to the County, plaintiffs testimony that Brennan took away virtually all of her former teaching assignments is insufficient.
As the court observed in Yanowitz, supra, 36 Cal.4th at page 1054, 32 Cal.Rptr.3d 436, 116 P.3d 1123, "mere offensive utterances or even a pattern of social slights ... cannot properly be viewed as materially affecting the terms, conditions, or privilege of employment for purposes of section 12940(a), but the phrase `terms, conditions, or privileges of employment' must be interpreted liberally...." When plaintiffs evidence is viewed under a totality-of-the circumstances approach and in the light most favorable to her, there are sufficient facts to raise a triable issue as to whether she suffered an adverse employment action within the limitations period, i.e., "adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion...." (Yanowitz, supra, 36 Cal.4th at pp. 1054-1055, 32 Cal.Rptr.3d 436,116 P.3d 1123.)
There is evidence showing that Brennan substantially reduced plaintiffs teaching assignments, which continued after July 1, 2003. The Department's records show that plaintiff taught no classes for most of 2002. In 2002 and 2003, she only taught classes on nine days. There is also evidence that this reduction in classes was attributable to race and age. This evidence is sufficient to raise a triable issue of fact concerning whether plaintiff suffered an adverse employment action. Substantially reducing or eliminating a teacher's classroom teaching assignments impairs the teacher's ability to perform the job for which she was hired and, in effect, relegates her to some undefined, but lesser, status other than that of a full time classroom *402 instructor. Therefore, a trier of fact could infer that it was "reasonably likely" that plaintiffs job performance within the limitations period was impaired by that action against plaintiff.

2. Nondiscriminatory Motive
In response to plaintiffs prima facie case, the County argues its evidence shows that Brennan did not dramatically curtail plaintiffs teaching assignments, and instead divided assignments equitably among nursing instructors, without regard to race or age. Nevertheless, the Department's own records show that plaintiffs teaching assignments were, and remained, substantially reduced. Accordingly, there is at least a triable issue of fact as to whether Brennan's workload assignments within the limitations period constituted adverse employment actions against plaintiff. The County did not submit evidence of a neutral, nondiscriminatory reason for substantially reducing plaintiffs workload because it denies that any such substantial reduction took place. Therefore, it failed to satisfy its burden to show a neutral, nondiscriminatory reason under the McDonnell Douglas test. As a result, the presumption of discrimination that arose from plaintiffs prima facie showing was not rebutted. Accordingly, Guz, supra, 24 Cal.4th at page 370, 100 Cal.Rptr.2d 352, 8 P.3d 1089 is distinguishable because that age discrimination case hinged upon the defendant's contention that its reason for the adverse employment action was justified and not related to age.

3. The Evidence of Pretext and Requisite Racial Animus
Based on the flawed assertion that it provided sufficient nondiscriminatory reasons for the reduction in plaintiffs teaching assignments, the County contends the ultimate burden of proving actual race discrimination shifted back to plaintiff, and she submitted no evidence sufficient to raise a triable issue of fact concerning pretext or the requisite racial animus. Even if the County had satisfied its burden under the McDonnell Douglas test, and rebutted the presumption of race discrimination, plaintiff contends that her evidence shows that the reduction in her teaching assignments was motivated by a racial animus.
Plaintiff supplied the requisite evidence of racial animus. Reta's testimony about Brennan's "Ebonics" comment and plaintiffs testimony that Brennan made derogatory remarks about other African-American coworkers constitute independent evidence of racial animus. Also raising a triable issue concerning racial animus is plaintiffs testimony that she was the only African-American among the four instructors in the MSD Unit and that Brennan asked plaintiff to "demote," took away her teaching assignments, gave those assignments to the other instructors who were not African-American, and monitored plaintiffs classroom performance, but not the performance of instructors who were not African-American. Moreover, the Department's investigation of plaintiffs allegations about Brennan's conduct toward her and other employees concluded that plaintiffs allegations were "founded."
The entirety of plaintiffs evidence when viewed in the light most favorable to her, raised a triable issue of fact concerning whether the employment actions taken against her within the limitations period were racially motivated.

E. There Is a Triable Issue of One or More Material Facts Concerning Plaintiffs Second Cause of Action for Racial Harassment

Triable Issues Concerning Hostile Work Environment
Defendants contend that plaintiffs evidence of racial harassment does not rise *403 to the level of the "severe" or "pervasive" conduct required to state a claim under the FEHA based on a hostile work environment. Plaintiff, relying on much of the same evidence that supports her race discrimination claim, argues that it also serves to raise a triable issue of fact concerning whether she was subjected to a hostile work environment.
"In California, [the FEHA] ... differs from Title VII in that it explicitly prohibits an employer from harassing an employee on the basis of race, sex, or other specific grounds. ([former] Gov. Code, § 12940, subd. (h) [currently subd. (j)(1)].) Harassment includes `[v]erbal harassment, e.g., epithets, derogatory comments or slurs....' (Cal.Code Regs., tit. 2, § 7287.6, subd. (b)(1)(A).) Yet, despite the differences in statutory language, in light of the parallel antidiscriminatory objectives, the California courts have been guided in their interpretation of FEHA by the federal court decisions interpreting Title VII. [Citations.] In particular, although no California cases have directly addressed racial harassment in the workplace, [fn. omitted] the California courts have applied the federal threshold standard to claims of sexual harassment and held that FEHA is violated when the harassment was `"`sufficiently severe or pervasive as to alter the conditions of the victim's employment.'"' [Citations.]" (Etter v. Veriflo Corp., supra, 67 Cal. App.4th at pp. 464-465, 79 Cal.Rptr.2d 33.) "[W]hether an environment is `hostile' or `abusive' can be determined only by looking at all the circumstances. These may include the `frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (Harris v. Forklift Systems, Inc. (1993) 510 U.S. 17, 22-23, 114 S.Ct. 367, 126 L.Ed.2d 295.)
In Dee v. Vintage Petroleum, Inc. (2003) 106 Cal.App.4th 30, 32-33, 129 Cal.Rptr.2d 923 (Dee), the plaintiff employee, a Filipino, testified that her supervisor asked her to lie about company business, to take a document from the desk of another supervisor without that supervisor's knowledge, insulted her, and used profanity in her presence. On one occasion, when discussing with plaintiff whether he had asked plaintiff to lie to another supervisor, plaintiffs supervisor asked, "Well, what are you, a Filipino?" When plaintiff replied in the affirmative, the supervisor stated, "Well it's your Filipino understanding versus mine." (Id. at p. 33, 129 Cal.Rptr.2d 923.)
In reversing defendants' summary judgment on the plaintiffs racial harassment claim under the FEHA, the court in Dee, supra, 106 Cal.App.4th 30, 129 Cal.Rptr.2d 923 held that "[a] reasonable trier of fact could infer that the racial slur was not an isolated event because it explained [the supervisor's] motivation for creating an abusive working environment for [the plaintiff]. [The plaintiffs] evidence showed that [the supervisor] called her a 'bitch' and constantly used the word `asshole.' He berated her, `harassed' her, ordered her to lie and blamed her for tasks he ordered her to perform." (Id. at p. 37, 129 Cal.Rptr.2d 923.) Based on the evidence of a single racial slur, the Dee court held that the plaintiff had raised sufficient facts to overcome the defendant's summary judgment motion on her racial harassment claim. In doing so, the court emphasized that when a supervisor makes a racially demeaning remark, rather than a coworker, the remark is attributed to the employer, and therefore even one such remark from a supervisor may be severe enough to alter the conditions of employment. *404 (Id. at pp. 36-37, 129 Cal.Rptr.2d 923.)
Here, plaintiffs evidence showed that Brennan made the "Ebonics" comment about plaintiff to Reta, and that Brennan also made derogatory racial comments to plaintiff concerning her African-American coworkers. Plaintiffs evidence also showed that Brennan substantially reduced her teaching assignments and excessively monitored plaintiffs classroom performance when plaintiff was allowed to teach. A reasonable trier of fact could infer from that evidence that plaintiffs race motivated Brennan's conduct during the limitations period in taking away the majority of her teaching assignments and giving them to instructors who were not African-American, and in monitoring plaintiffs performance while not monitoring the nursing instructors who were not African-American. Looking at all the circumstances, plaintiff has raised a triable issue of fact as to whether Brennan's conduct during the limitations period was severe and pervasive enough to alter the conditions of plaintiffs employment and thereby constituted actionable racial harassment.

2. Brennan Is Not Immune Under Section 820.2[**]

*406 F. Plaintiff Failed to Exhaust Her Administrative Remedies as to Her Third Cause of Action Against the County for Failure to Prevent Discrimination and Harassment Under FEHA[**]

G. There Is a Triable Issue of One or More Material Facts Concerning Plaintiffs Fourth Cause of Action for Age Discrimination
"[T]he policy against age discrimination has been fully delineated by statute. The FEHA not only declares a general policy against age discrimination in employment, but also expressly prohibits discrimination against older workers by employers...." (Stevenson v. Superior Court (1997) 16 Cal.4th 880, 895, 66 Cal. Rptr.2d 888, 941 P.2d 1157.) As noted above, because direct evidence of a discriminatory motive is rare, plaintiffs are usually required to prove such motive circumstantially, using the burden shifting mechanism laid out in McDonnell Douglas. (See Guz, supra, 24 Cal.4th at p. 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 ["This socalled McDonnell Douglas test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially"]; Muzquiz v. City of Emeryville (2000) 79 Cal.App.4th 1106, 1116, 94 Cal. Rptr.2d 579 ["Because direct evidence of such discriminatory motivation is rarely available, the courts have established a system of shifting burdens in an attempt to aid the presentation and resolution of employment discrimination claims that rely on circumstantial evidence to prove discriminatory intent"].) In this case, however, there is direct evidence of discriminatory motivation based on plaintiffs ageBrennan's statements about plaintiff being too old and wanting younger teachers in the classroomso that any burden *407 shifting analysis using the McDonnell Douglas test is unnecessary. (Trop v. Sony Pictures Entertainment, Inc., supra, 129 Cal.App.4th at p. 1144, 29 Cal.Rptr.3d 144.)
Plaintiff testified that Brennan requested she "demote," wanted younger instructors in the classroom, and hired younger instructors to teach classes formerly taught by plaintifftestimony that raises a triable issue of fact as to whether there was an adverse employment action within the limitations period that was motivated, at least in part, by plaintiffs age. Plaintiff associated these comments directly with the reduction of her teaching assignments, which, as noted above, continued during the limitations period. The County did not defend the reduction in plaintiffs teaching assignments by showing an age-neutral motive for that action, such as, for example, poor performance. Instead, the County maintained that plaintiffs teaching assignments were not substantially reduced. But, as stated above, there is evidence from the County's own records contradicting its assertion. Thus, plaintiff has established a triable issue of fact as to the fourth cause of action.

H. There Is a Triable Issue of One or More Material Facts Concerning Plaintiffs Fifth Cause of Action for Retaliation
Plaintiff claims that she suffered adverse employment action because of her complaints to Brennan's supervisors about discrimination. As with their contentions concerning plaintiffs race discrimination, racial harassment, and age discrimination claims, defendants contend that plaintiffs retaliation claim fails because there is insufficient evidence of an adverse job action, and plaintiff failed to raise a triable issue concerning a retaliatory motive.
Brennan's reduction of plaintiffs teaching assignments occurred, in part, within the limitations period and, as noted, could reasonably be construed as an adverse employment action against plaintiff. Moreover, plaintiff had twice complained to Brennan's supervisors about Brennan's racially motivated mistreatment of plaintiff, once outside the limitations period and once within the period. These complaints constituted a "protected activity" under the FEHA "for which the employee may not properly be subjected to retaliation." (Yanowitz, supra, 36 Cal.4th at p. 1035, 32 Cal.Rptr.3d 436, 116 P.3d 1123.)
Following plaintiffs first complaint to Captain Barrantes, Brennan confronted plaintiff stating, "Nobody screws me!I will screw you back!I won't forget you and Captain Barrantes can kiss my ass!" Although Brennan made no similar comment to plaintiff after her second complaint to Captain Penner in October 2003, the comment made after the first complaint to Captain Barrantes supports a reasonable inference that the adverse employment action against plaintiff within the limitations period was in retaliation for plaintiffs complaints about Brennan. Defendants provided no "legitimate, nonretaliatory reason for the adverse employment action" (Yanowitz, supra, 36 Cal.4th at p. 1042, 32 Cal.Rptr.3d 436, 116 P.3d 1123), but rather claim there was no adverse employment action. As we have held, there is a triable issue of fact as to whether there was such an adverse employment action. Therefore, plaintiffs evidence is sufficient to raise a triable issue of fact concerning whether Brennan's acts within the statutory period were retaliatory.

*408 DISPOSITION
The judgment in favor of the County and Brennan is reversed as to the first, second, fourth, and fifth causes of action, and the summary adjudication as to the third cause of action is affirmed. Costs are awarded to plaintiff.
I concur: TURNER, P.J.
ARMSTRONG, J.
I concur with the majority's ruling on the third cause of action. As to the other causes of action, I believe that defendants were entitled to judgment, and I thus respectfully dissent.
I have examined and re-examined this record, and cannot see a case of illegal discrimination, in any form or under any theory. There is nothing here but a case of an employee who was unhappy at work. The only conclusion which can be drawn from the facts at summary judgment is that Hammond did not like Brennan or the work Brennan assigned her to do. That does not create a violation of FEHA or give Hammond any right to recover against Brennan or the County. The majority finding to the contrary is based on mistakes about the law and the undisputed facts.
Here is but one of the factual errors: Hammond's unverified complaint put the date of Brennan's appointment as December 2001, and Hammond repeated that date in her deposition, attempting to use the speediness of Brennan's actions as proof of her improper motives. The date is wrong. Brennan started in December 2000, a fact which is amply documented in the record.
Not only that, the fact was undisputed at summary judgment. Defendants proposed as undisputed that "After ... Brennan was assigned to head up the Staff Development Unit in approximately December 2000, she was tasked with increasing the quality and quantity of education and training of Sheriffs Medical Services personnel...." Hammond's response was "Disputed to the extent that defendant attempts to assert an excuse for Brennan's conduct." In other words, the fact was undisputed.
The majority relies on the wrong date and refers to the undisputed fact as a "discrepancy in the evidence." This is a fundamental misunderstanding of the summary judgment process. At summary judgment, there are disputed facts and undisputed facts. A "discrepancy in the evidence" is not a recognized category. What's more, an undisputed fact is an undisputed fact even if someone with a bad memory (and Hammond's memory was bad) once testified to something different.
Defendants proposed as undisputed that Brennan started in December of 2000, and Hammond proffered nothing, not even her own testimony, to the contrary. The trial court was not free to evaluate this case as though Brennan might after all have started the job in December 2001, and neither are we. "A defendant's ... motion for summary judgment tests the existence of evidence to support the complaint's ... allegations." (Columbia Casualty Co. v. Northwestern Nut. Ins. Co. (1991) 231 Cal. App.3d 457, 468, 282 Cal.Rptr. 389, emphasis added.)
The majority also writes that the date "does not matter." Of course it does. First, Hammond's theory that bias can be inferred from the speed of Brennan's actions disappears. If anything, the inference is to the contrary.
*409 The date matters for statute of limitations, too. According to Hammond, she was "stripped" of her classes immediately after Brennan started. Given that Brennan actually started at the end of 2000, that allegedly discriminatory act took place in the beginning of 2001not, as the majority would have it, in 2002. Another part of Hammond's theory of the case is that she complained to Barrantes soon after the discriminatory change in assignments took place. It was undisputed that Hammond's meeting with Barrantes was in August 2002, 16 months after Brennan took over, and that that was her first complaint about discrimination at Brennan's hands. After her meeting with Barrantes, Hammond knew that her teaching load would not be restored.
If I thought that the reduction in teaching load could be considered a FEHA violation (and I do not), I would find that both the early 2001 assignment changes and the mid-2002 meeting with Barrantes were "discrete act[s] of discrimination" which caused the limitations period to commence. (Ledbetter v. Goodyear Tire & Rubber Co., Inc. (2007) ___ U.S. ___, 127 S.Ct. 2162, 2165, 167 L.Ed.2d 982.) The majority's holding on statute of limitations essentially rests on a theory that there was a FEHA violation every timeevery day?Hammond was not assigned to teach a class (no matter what else she was assigned to do), essentially allowing an infinite period of limitations. I do not think Ledbetter, supra, permits such a theory.
This case is indistinguishable from Ledbetter on this point. Like the evaluations and pay adjustments in that case, the reduction in teaching assignments was a discrete event. Even if it continued to have negative effects, the statute commenced when the act occurred.
For the same reason, I do not see that the continuing violation doctrine could save this case. Application of that doctrine depends on unlawful acts during the limitations period (Richards v. CH2M Hill, Inc. (2001) 26 Cal.4th 798, 812, 111 Cal.Rptr.2d 87, 29 P.3d 175), and there were none.
Before I write further about the factual errors, I must digress (but it is no digression) to note that the majority has fundamentally erred by relying on the shifting burdens described in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. In this summary judgment case, the burdens are not those described in McDonnell Douglas, but those described in Guz v. Bechtel Nat. Inc. (2000) 24 Cal.4th 317, 100 Cal.Rptr.2d 352, 8 P.3d 1089. This is true because defendants, like the employer in Guz, "did not stand mute, relying solely on the premise that [Hammond] failed to demonstrate a prima facie case of ... discrimination. As an additional basis for [their] motion, [defendants] proceeded directly to the second step of the McDonnell Douglas formula. [They] set forth competent, admissible evidence [citations] of its reasons, unrelated to ... bias," for their actions. (Id. at p. 357, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) That is, defendants produced evidence that to the extent that Hammond's job duties were changed, they were changed for reasons having to do with staffing and workload, not age or race bias. Those reasons were "creditable on their face." (Id. at p. 353, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) That means that to survive summary judgment, Hammond "was thus obliged to point to evidence raising a triable issuei.e., permitting an inference that, notwithstanding [defendants'] showing, *410 its ostensible reasons were a mask for prohibited ... bias." (Ibid.) This she failed to do.
Hammond's case is built around the notion that her teaching assignments were taken away and given to young, non-African American employees, leaving her with nothing to do but sit and stare at the walls, and that Brennan's discriminatory motives are established by those facts and by her discriminatory comments. The majority accepts the theories by ignoring the undisputed facts and the trial court's evidentiary rulings and by forgetting the well-established rule that "[t]he party opposing the summary judgment cannot rely on its pleadings, but must make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact if the moving party's evidence, standing alone, is sufficient to entitle the party to judgment." (Buehler v. Alpha Beta Co. (1990) 224 Cal. App.3d 729, 733, 274 Cal.Rptr. 14.)
Let us examine the real facts, and lack thereof, at summary judgment.
Brennan doubled the number of nurse instructors from two to fourin order to improve training, which was her job. It is not surprising that when the staff doubled, Hammond's classroom assignments were reduced by about 50 percent. Here, the majority seems to be laboring under a misapprehension of the parties' positions, writing that defendants' contention is that Hammond's teaching assignments were not reduced. That was not defendants' position. Instead, they proffered the undisputed fact that the changes in assignments were not based on illegal discrimination.
It was undisputed that Brennan assigned "approximately an equal amount of work" to each of the nursing instructors, and that "[A]fter beefing up the staffing for the SDU in 2001, Brennan divided the teaching assignments equitably among the four instructors based on their interests, background and on her best judgment." Hammond "disputed" this fact only by asserting that she taught fewer classes after Brennan arrived, thus confusing change with discrimination.
The majority writes something odd about this undisputed fact, that with it, defendants "suggest that [they] did not take away the majority of plaintiffs teaching assignments and give them to the three instructors who were not African-Americana denial rather than an explanation of plaintiffs claim of a reduction in assignments." On review after summary judgment, we liberally construe the evidence in favor of the party opposing summary judgment.. Like the "discrepancy," the "suggestion" is not a category we consider at summary judgment. We "liberally construe the evidence in support of the party opposing summary judgment" (Yanowitz v. L'Oreal USA Inc. (2005) 36 Cal.4th 1028, 32 Cal.Rptr.3d 436, 116 P.3d 1123), but we do not ignore undisputed facts.
On this record, the reasons for the assignments are not a "suggestion" or a "denial" or a "discrepancy," but an undisputed fact, on which we must base our ruling.
It is also a creditable showing under Guz, shifting the burden to Hammond. She presented no evidence about the teaching load of the other nurse instructors and thus no evidence in support of her main theory, that the reduction in teaching assignment was particular to her, because of her age and/or race. (Colarossi v. Coty U.S. Inc. (2002) 97 Cal.App.4th 1142, 1153, 119 Cal.Rptr.2d 131.)
The only facts at summary judgment on the ages and races of the other instructors *411 were that the two new nurse instructors Brennan hired were 52 and 42 years old. Of the 13 volunteers Brennan selected in the spring of 2001 to train the staff on the new defibrillators, five were African-American and the rest were White, Asian, or Hispanic. None were in their twenties, as Hammond complained at her deposition. Instead, three were in their thirties, and the rest ranged in age from 42 to 78.
Yes, Hammond testified that the new hires were young and not-African American, but in light of the facts, that is not enough. An employer is "`entitled to judgment as a matter of law if ... the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.' (Reeves [v. Sanderson (2000)] 530 U.S. 133, 148-149 [120 S.Ct. 2097, 2109, 147 L.Ed.2d 105].)" (Guz v. Bechtel Nat. Inc., supra, 24 Cal.4th at pp. 361, 362, 100 Cal.Rptr.2d 352, 8 P.3d 1089.)
It is true that Hammond was the only African-American nurse instructor. The majority (which ignores the actual ages and races of the defibrillator volunteers) writes that from that fact, a finder of fact could "infer" a racial motivation for the reduction of Hammond's teaching assignments. How? There is no evidence that any African-American applied for the job when Brennan augmented the staff, or that African-Americans were discouraged from applying for the job, or anything else which would justify an inference of racism. The inference is not permissible.
The evidence on Hammond's assignments? Even she conceded that in 2002/2003, the period in which discrimination is alleged to have taken place, she was assigned to teach 20 hours of a 40hour orientation class for new nurses. She was also assigned to research, develop and write a course for suicide prevention in the custody setting, to provide a spinal cord injuries-assessment class (estimated to take three months of dedicated work), and to prepare a class for assessment and care of patients with limited mobility. Because of her background in obstetrics, she was assigned to prepare and to present a class on the assessment of fetal heart tones, which involved research and preparation of a lesson plan. She was also responsible for researching and developing a lesson plan for three eight-hour classes for Certified Nursing Attendants, something that would require five to eight hours of work for each hour to be taught, and for researching and developing an updated lesson plan for teaching the Lyteport machine, which delivers oxygen, oxygen under pressure, and can suction bodily fluids while providing cardiopulmonary resuscitation to critically ill patients. And the list goes on. If Hammond spent time doing nothing, staring at the walls, she was neglecting her work, and her performance evaluations would have reflected that fact.
The evidence of Brennan's allegedly discriminatory comments is no better. On the question of age discrimination, Hammond testified that Brennan said that she wanted "the new people" who "had no experience," in the classroom "to get some experience," but that is not age discrimination, it is management. Certainly, Hammond presented no evidence of pretext, that is, for instance, that the new people did not need experience.
Hammond testified that Brennan "wouldif they would say something about anybody black she would say, `They don't know anything, they dumb.' She said it about Dr. Hart, she said it about Dr. Clark, she said it about Stella Jackson which was nurse manager. They didn't have any sense, they were dumb." That is *412 testimony that in some unspecified context, in response to unspecified comments, Brennan indicated that she had a low opinion of the intelligence of three specific African-American employees. The comments are not even placed in time, so that we could determine when they were made, vis a vis Brennan's actions, and the statute of limitations.
The majority writes that this is an "example" of Brennan's derogatory remarks, and from such remarks, we can "infer" a racial motivation for the reduction in Hammond's teaching assignments. This is no "example," it is the only potential evidence of racial bias which Hammond could produce. (The "Ebonics" comment cannot be considered for two reasons. It was not alleged as a discriminatory act in the complaint. (Government Employees Ins. Co. v. Superior Court (2000) 79 Cal.App.4th 95, 99, fn. 4, 93 Cal.Rptr.2d 820). Further, the only evidence of the comment is found in Reta's declaration, and defendants' objection to that declaration was sustained.) Three derogatory remarks about three specific people other than the plaintiff, with no context whatsoever, is not "... evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions." (Guz v. Bechtel Nat. Inc., supra, 24 Cal.4th at p. 361, 100 Cal.Rptr.2d 352, 8 P.3d 1089, original italics.)
What of the Department's June 2004 response to Hammond's complaint about Brennan? Hammond relied on this letter in her brief on appeal and the majority relies on it in the opinion. What Hammond did not do in her brief is acknowledge that the trial court excluded the letter, or contend that the trial court erred in so doing. "On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. (Artiglio v. Corning Inc. (1998) 18 Cal.4th 604, 612, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)" (Guz, supra, 24 Cal.4th at p. 334, 100 Cal.Rptr.2d 352, 8 P.3d 1089, emphasis added; Yanowitz, supra, 36 Cal.4th at p. 1037, 32 Cal.Rptr.3d 436, 116 P.3d 1123.) The letter is not "part of the evidentiary record on appeal," and can play no part in our analysis.
At any rate, the document amounts to nothing. Hammond's complaint was that Brennan harassed her because Brennan was prejudiced against African-Americans, and as payback for Hammond's bad relationship with another employee, whom Brennan liked. Hammond complained that Brennan had said that specified Black employees were "dumb," and that she "openly curses in front of the staff." On these allegations, the Department concluded that the complaint was founded and that Brennan "acted inappropriately," toward Hammond and treated Hammond "differently than other employees."
But on what grounds were the allegations founded? Did Brennan act inappropriately when she "openly cursed," or because she denigrated an employee in front of another employee? In what manner, and on what basis, was Hammond "treated differently?" The document does not say that Brennan engaged in illegal discrimination, or that there was anything illegal or improper about the way in which she assigned work.
Defendants set forth competent, admissible, creditable evidence of reasons for their actions that were unrelated to bias, so that it was up to Hammond to point at evidence raising a triable issue of pretext. (Guz, supra, 24 Cal.4th at p. 357, 100 Cal.Rptr.2d 352, 8 P.3d 1089.) The burden *413 was on her to explain what the report meant, and, typically, she did not.
There are also many problems with the majority's interpretation of the law. I have already written about the statute of limitations, and the problems with the majority's allocations of the burdens of proof. I feel constrained to note two more, the majority's understanding of the adverse employment action requirement and of a hostile environment cause of action.
An adverse employment action is one which "materially affect[s] the terms, conditions, or privileges of employment." (Yanowitz v. L'Oreal USA, Inc., supra, 36 Cal.4th at pp. 1054-1055, 32 Cal.Rptr.3d 436, 116 P.3d 1123.) The majority's holding on this point is unusual. It is that a reduction in a teacher's teaching assignments impairs the teacher's ability to perform the job "for which she was hired," and relegates her to "some undefined, but lesser, status" and from all of that, a trier of fact could "infer" that it was reasonably likely that Hammond's job performance was impaired by the actions against her. This is all totally unsupported, without foundation in law or in the record.
Hammond's positive evaluationsfrom Brennan!negate the majority's speculation of impaired job performance. Brennan wrote that Hammond had "very good work habits," and a "keen interest in her work," and setting "a high standard of performance for herself and having "a personal drive that has motivated her to pursue her educational goals and to enhance her professional growth." Besides, an employee cannot create an adverse employment action by doing her work poorly, even if she does not like her assignment, and Yanowitz, supra, does not hold to the contrary.
Next, nothing in the record supports the notion that the nurse instructors were hired exclusively as classroom teachers and that the director of the unit could not change their classroom hours as circumstances dictated, or properly assign them to develop as well as teach classes. As Hammond succinctly put it when she explained why she did not complain about the reduction in her teaching load, Brennan "is the leader and she was in charge and the one in command...."
Nor is there anything in the record that supports the notion that the change in Hammond's duties gave her a "lesser status." She retained the title "nurse instructor." Her office remained in the unit. She received serious and responsible assignments. For instance, she was to represent the SDU in Infection Control meetings and to coordinate infection control and HIV classes, required annually of all Medical Services staff. In August 27, 2002, she was given an assignment to develop a formal lesson plan for the treatment and care of paraplegics and quadriplegics, an assignment which would take months of work. How is any of that "lesser?" Hammond produced no facts to support such a notion, yet the majority says so.
Hammond was to spend less time teaching and more time creating classes through which jail personnel could be properly trained. Some employees might like such a change. Hammond apparently did not. She nowhere says why, but that does not matter. "A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient. Requiring an employee to prove a substantial adverse job effect `guards against both "judicial micromanagement of business practices," [citation] and frivolous suits over insignificant slights.' (Russell v. Principi (D.C.Cir.2001) 257 F.3d 815, 818.) Absent this threshold showing, courts will be thrust into the role of personnel officers, becoming entangled in every conceivable *414 form of employee job dissatisfaction." (Akers v. County of San Diego (2002) 95 Cal.App.4th 1441, 1455, 116 Cal.Rptr.2d 602.)
Thus, in Malais v. Los Angeles City Fire Dept. (2007) 150 Cal.App.4th 350, 58 Cal.Rptr.3d 444, a firefighter did not show adverse employment action when his special duty assignments did not bar him from promotions or overtime pay. The court drew the important distinction, which the majority does not draw here, writing that the reason the employee was dissatisfied was because he "preferred the work, schedule, and camaraderie of platoon duty to that of special duty, not that he suffered any adverse employment consequences from being limited to special duty." (Id. at p. 358, 58 Cal.Rptr.3d 444.) That is this case.
The majority also finds adverse action in the disputed facts about classroom monitoring. Hammond testified that when she taught (but, of course, she also testified that she was not allowed to teach) her classes were monitored, and that the performance of other teachers was not. Defendants proffered evidence that all teachers were monitored equally, and also proffered evidence that Hammond's student evaluations were bad. "Needs to be more prepared," "Very hard to understand," and so on were typical comments. There is perhaps a triable issue of fact on whether Hammond was monitored more than other employees, but what if she was? Supervision, by a supervisor, is not an adverse employment actionespecially when the monitored employee receives good performance reviews from that supervisor.
What of the other, alleged adverse actions, which the majority relegates to a footnote? One of those other actions alleged by Hammond is that Brennan coerced Reta into filing a false complaint against "her. We originally based our opinion on that "fact," but we vacated our opinion when defendants correctly pointed out that there was no evidence that the complaint was false. Instead, the evidence was that another employee made a complaint about Hammond, that Hammond believed that Reta had made the complaint, and told him "you're not going to get away with it. Cristobel's [another nurse instructor] not going to get away with it, and surely Ms. Brennan's not going to get away with it." Reta told Brennan what had happened, and Brennan told Reta to file a complaint. Beyond a doubt, that was the correct thing for her to do.
For an employee to prevail on summary judgment in an employment case such as this one, "there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions. [Citation.] Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (Guz, supra, 24 Cal.4th at p. 361, 100 Cal.Rptr.2d 352, 8 P.3d 1089, italics omitted.) Under that standard, Hammond should not prevail.
I need say very little about the hostile environment harassment cause of action. Lyle v. Warner Bros. Television Productions (2006) 38 Cal.4th 264, 283-284, 42 Cal.Rptr.3d 2, 132 P.3d 211 makes it very clear that three slighting remarks, about someone other than the plaintiff, are not severe enough or sufficiently pervasive to alter the conditions of employment, and do not make a cause of action for hostile environment discrimination.
*415 Laws which protect employees from race and age based discrimination are vital parts of our jurisprudence. Public confidence in those laws, and plaintiffs with real claims, are only damaged when an unhappy employee who has suffered no discrimination is allowed to proceed on untenable, because-I-say-so claims such as those raised here. That is the basis of my dissent.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of DISCUSSION, parts E2 and F.
[1] Government Code section 12900 et seq. All further statutory references are to the Government Code unless otherwise stated.
[2] We state the facts in accordance with the standard of review applicable to summary judgments discussed post. Plaintiff alleges facts concerning other grievances that are not necessary to recite in light of our holding that the following facts create triable issues.
[3] See footnote 7 post. At the time Brennan was assigned as supervisor of the MSD Unit, the Department's Medical Services personnel included, in addition to physicians and mental health clinicians, approximately 600 registered nurses, licensed vocational nurses, certified nurse attendants, and registered nurse practitioners.
[4] As to the admissibility of this letter, see post.
[5] Penal Code section 832.7, subdivision (e) provides as follows: "(1) The department or agency shall provide written notification to the complaining party of the disposition of the complaint within 30 days of the disposition. (2) The notification described in this subdivision shall not be conclusive or binding or admissible as evidence in any separate or subsequent action or proceeding brought before an arbitrator, court, or judge of this state or the United States."
[6] McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.
[7] There was a discrepancy in the evidence as to whether Brennan became the supervisor of the MSD Unit in 2000 or 2001, and therefore when her adverse actions against plaintiff began. But it does not matter for statute of limitations purpose because defendants contend all acts prior to July 1, 2003, are time-barred.
[8] Section 12960, subdivision (d) provides, "No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred [with certain exceptions not asserted in this case]." "The timely filing of an administrative complaint, and exhaustion of that remedy, is a prerequisite to maintenance of a civil action for damages under the FEHA." (Balloon v. Superior Court (1995) 39 Cal.App.4th 1116. 1120, 46 Cal.Rptr.2d 161.)
[9] Richards v. CH2M Hill, Inc.(2001) 26 Cal.4th 798, 812, 111 Cal.Rptr.2d 87, 29 P.3d 175 [an employer is liable "for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period"].
[10] Title 42 United States Code section 2000e-2(a) 1 (unlawful to discriminate because of a person's sex).
[11] The County submitted evidence of nondiscriminatory reasons for alleged adverse employment actions other than the reduction in teaching assignments, such as, for example, plaintiff's relocation to Men's Central Jail. We do not address these other alleged adverse employment actions.
[**] See footnote*, ante.